FILED
United States Court of Appeals
Tenth Circuit

July 2, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

NATHAN ANDREW BRIGGS,

     Defendant - Appellant.

No. 12-5140

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 4:12-CR-00051-GKF-1)**

---

Terry L. Weber, Tulsa, Oklahoma, appearing for Appellant.

Leena Alam, Assistant United States Attorney (Danny C. Williams, Sr., United States Attorney, and Eric O. Johnston, Assistant United States Attorney, on the brief), Office of the United States Attorney for the Northern District of Oklahoma, Tulsa, Oklahoma, appearing for Appellee.

---

Before **HARTZ, McKAY,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

In 2012, police detained Appellant Nathan Briggs and discovered a handgun in his possession. He was charged with, and pled guilty to, being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

In pleading guilty, Mr. Briggs reserved the right to appeal the district court's denial of his motion to suppress the weapon seized from his possession. On appeal, he argues the weapon should have been suppressed because police violated his Fourth Amendment rights by detaining him. Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that Mr. Briggs's detention was constitutional, and we affirm the denial of his suppression motion.

## I. BACKGROUND

Because this is an appeal from the denial of a motion to suppress, we recite the facts in the light most favorable to the government and accept the district court's findings of fact unless they are clearly erroneous. *See United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003).

### A. *Factual History*

On the afternoon of January 19, 2012, Tulsa Police Officers Heath Cannon and Shane Pryce were patrolling the area of South Peoria Avenue and 64th Street in Tulsa, Oklahoma. They drove a black Dodge Charger that had tinted windows, light bars on the front and back windshields, and police lights on its fog lights and mirrors. Although unmarked, the car was identifiable as a law enforcement vehicle. The officers wore khaki pants and blue jerseys that identified them as law enforcement officers.[1]

From their training and experience, the officers knew the neighborhood to be a

---

[1] The jerseys displayed a Tulsa Police Department badge/emblem on the shoulder and said "Tulsa Police" in yellow letters on the back.

high-crime area, including gang activity, violent crime, and drug crimes. Tulsa police routinely patrolled the area, and Officer Cannon had made weapons and narcotics arrests there. Officer Pryce also had spent time patrolling the area, had investigated two shootings there, and knew of three other shootings in the area in the past year.

As the officers turned west off South Peoria Avenue and onto 64th Street, they observed two men walking eastbound toward them. The men were approximately one block away. When the officers' vehicle came into view, the men immediately turned northbound onto a cross-street, Owasso Avenue.

One of the men, who was later identified as Mr. Briggs, repeatedly looked over his shoulder at the officers. Officer Cannon noticed that Mr. Briggs grabbed at the waistline of his pants. Officer Cannon later testified that, in his training and experience, people who illegally carry weapons often keep them at their waistline and touch or grab at the weapon when they encounter police.

As the officers' vehicle approached them, the men picked up their pace. Officer Pryce testified that one of the men was doing the "closest thing to running without running," while the other "was not far behind, high-stepping, walking really, really fast." ROA, Vol. 2 at 36-37.

The men approached a home on the west side of Owasso Avenue. According to Officer Pryce, the men split paths. Mr. Briggs entered the middle of the yard and continued north as the other man went to the door of the home and began knocking. The men were at least 10 yards apart.

The officers pulled up to the home and exited their vehicle. Mr. Briggs continued to walk away from the officers and to grab at his waistline. Officer Cannon asked the men to come over and speak with them. Mr. Briggs turned, faced the officers, and began backing away. Officer Pryce said, "[H]e's gonna run." *Id*. at 12. At that moment, Mr. Briggs's companion, who had been knocking at the door of the home, took off running. Officer Pryce pursued him on foot.[2]

When the other man took off running, Officer Cannon drew his duty weapon and instructed Mr. Briggs not to run. Mr. Briggs said he would not. As Officer Cannon approached, Mr. Briggs said, "Man, I've got a gun on me." *Id.* at 13. Officer Cannon handcuffed him and located a .40-caliber pistol on Mr. Briggs's right hip, the same area that Mr. Briggs had been grabbing.

The officers estimated that the time between their arrival at the Owasso Avenue home and the flight of Mr. Briggs's companion was only a matter of seconds.

B. *Procedural History*

Because Mr. Briggs had prior felony convictions, he was indicted on one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Mr. Briggs filed a pretrial suppression motion to exclude the weapon as evidence at trial. He argued that Officer Cannon violated his Fourth Amendment rights by detaining him without reasonable suspicion that he was engaging

---

[2] Mr. Briggs's companion was never apprehended.

in criminal activity, and thus the weapon should be excluded as trial evidence.

Repeatedly stating that the issue was a "close call," *id.* at 67, 70, the district court denied Mr. Briggs's motion. The court considered the following circumstances in holding that Officer Cannon had reasonable suspicion to detain Mr. Briggs: (1) Mr. Briggs and his companion were walking in a high-crime area; (2) the men changed direction and picked up their pace upon seeing the police vehicle; (3) Mr. Briggs repeatedly grabbed at his waistline; (4) the two men took divergent paths into the yard of the Owasso Avenue home; (5) when officers asked to speak with the men, Mr. Briggs turned and backpedaled, exhibiting nervous, evasive behavior; and (6) Mr. Briggs's companion fled after the officers' arrival. The court said "none of the various factors, standing alone, would provide a lawful basis for an investigative detention." *Id.* at 70. But, the court held, the totality of the circumstances provided Officer Cannon with reasonable suspicion to detain Mr. Briggs.

Mr. Briggs pled guilty to the indicted count and was sentenced to 51 months of imprisonment. He reserved the right to appeal the denial of the suppression motion and filed timely notice of appeal.

## II.    **DISCUSSION**

It is undisputed that Officer Cannon detained Mr. Briggs by drawing his weapon and ordering Mr. Briggs not to run. The issue on appeal is whether Officer Cannon's detention of Mr. Briggs was reasonable under the Fourth Amendment. We "accept the district court's findings of fact and credibility determinations unless clearly erroneous,

and review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. Benard*, 680 F.3d 1206, 1210 (10th Cir. 2012).

## A. *Investigative Detentions Under the Fourth Amendment*

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "A seizure occurs when a reasonable person would not feel free to leave or disregard the contact." *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) (quotations omitted). An investigative, non-consensual detention constitutes a seizure under the Fourth Amendment. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). An officer may constitutionally "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Neff*, 681 F.3d 1134, 1137-38 (10th Cir. 2012) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).[3]

An investigative detention is based on reasonable suspicion if the detaining officer has "a particularized and objective basis for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quotations omitted). This

---

[3] In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court created a two-part test to determine the reasonableness of an investigatory detention. "For an investigatory detention to be reasonable it must be 'justified at its inception' and the officer's actions must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013) (quoting *Terry*, 392 U.S. at 20). Mr. Briggs only contests whether his detention was justified at its inception.

requires the officer's detention to be based on "something more than an inchoate and unparticularized suspicion or hunch." *Sokolow*, 490 U.S. at 15 (quotations omitted). Nevertheless, "the level of suspicion required for reasonable suspicion is 'considerably less' than proof by a preponderance of the evidence or that required for probable cause." *United States v. Lopez*, 518 F.3d 790, 799 (10th Cir. 2008) (quoting *Sokolow*, 490 U.S. at 7). Even if it is more likely that an individual is not involved in criminal activity, an officer still may have reasonable suspicion to stop and detain the individual. *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). The detaining officer needs only to articulate "some minimal level of objective justification" for the detention. *Sokolow*, 490 U.S. at 7 (quotations omitted).

Finally, our Fourth Amendment analysis is "guided by the 'touchstone' of reasonableness." *Salas-Garcia*, 698 F.3d at 1248 (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). "[W]e look to the totality of the circumstances" known to the detaining officer "rather than assessing each factor or piece of evidence in isolation." *McHugh*, 639 F.3d at 1256 (quotations omitted). Courts also must "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) (quotations omitted). Our analysis is an objective one, asking "whether 'the facts available' to the detaining officer, at the time, warranted an officer of 'reasonable caution' in believing 'the action taken was appropriate.'" *Id.* (quoting *Terry*, 392 U.S. at 21-22).

B. *Investigative Detention of Mr. Briggs*

The district court considered six factors in determining whether Officer Cannon constitutionally detained Mr. Briggs. We first discuss the relevance of these factors to the Fourth Amendment inquiry. We then determine whether the factors, in their totality, provided Officer Cannon with a particularized, objective basis to suspect that criminal activity was afoot. *See United States v. Madrid*, 713 F.3d 1251, 1256 (10th Cir. 2013).

1. **High-crime area**

Officers Cannon and Pryce were patrolling an area they knew, from their training and experience, to be one of high criminal activity. The district court considered this factor as relevant but said it was insufficient alone to provide a reasonable basis to suspect Mr. Briggs of criminal activity. We agree.

"[T]he fact that a stop occurred in a high-crime area cannot alone justify" an investigative detention. *McHugh*, 639 F.3d at 1257; *see also Brown v. Texas*, 443 U.S. 47, 52 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."). However, a suspect's presence in a high-crime area is still relevant to whether the totality of the circumstances justify a detention. *See McHugh*, 639 F.3d at 1257; *United States v. Guardado*, 699 F.3d 1220, 1223 (10th Cir. 2012) ("[W]hile presence in a high-crime area, alone, does not establish reasonable suspicion, the district court correctly factored the area's high crime-rate into its analysis.").

Here, Officer Cannon knew the area to have significant criminal activity. He had

previously made arrests in the area based on gang involvement, weapons crimes, violent crimes, and narcotics transactions. It was an area he routinely patrolled because of "high gang activity and high drug activity." ROA, Vol. 2 at 8-9.

Although Officer Cannon could not have constitutionally detained Mr. Briggs on this basis alone, it is a relevant factor.

2. **Change of direction and increased pace**

The record shows that Mr. Briggs and his companion walked eastbound on 64th Street and suddenly changed course as the officers' vehicle came into view. Mr. Briggs and his companion also increased their pace as the officers' vehicle approached. The district court determined these facts were insufficient to justify a detention, although the court considered them relevant. We agree with this reasoning.

Although not "of ironclad significance," a suspect's evasive or erratic movements are considered as part of the totality of the circumstances that may justify a detention. *Sokolow*, 490 U.S. at 8; *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). We have recognized that a suspect's "[f]urtive movements" are "appropriate . . . to consider in determining whether reasonable suspicion exists." *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009).

Other courts have found relevant a suspect's sudden change of direction and speed of travel upon contact with officers. *See, e.g.*, *United States v. Johnson*, 620 F.3d 685, 694 (6th Cir. 2010) ("[W]e [have] held that the speed of the suspect's movements to get

away may be relevant to the totality of the circumstances for reasonable suspicion, and we have considered the abruptness and other evasive characteristics of a suspect's departure upon noticing the police to determine whether his reaction contributes to reasonable suspicion." (citation omitted) (quotations omitted)); *United States v. Mayo*, 361 F.3d 802, 807 (4th Cir. 2004) (noting that a suspect saw police and sought to evade scrutiny by "turn[ing] 180 degrees and walk[ing] from the street into an adjacent apartment complex" (quotations omitted)); *United States v. Edmonds*, 240 F.3d 55, 57 (D.C. Cir. 2001) (considering that a suspect saw police and pivoted, turned away, and walked rapidly toward a nearby van). A suspect's glances over his shoulders, seemingly expressing concern about pursuit, also can be relevant to the reasonable suspicion analysis. *See United States v. Aitoro*, 446 F.3d 246, 242 (1st Cir. 2006) (noting that a suspect was "looking warily over [his] shoulders, as if concerned about pursuers," which "could reasonably have further heightened the officers' suspicion" that he was fleeing).

But not all attempts to avoid police contact raise suspicions of criminal activity. We have held that "making and then breaking eye contact with the officers, and then walking away from the officers . . . do not furnish the basis for a valid *Terry* stop." *Unites States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996). The Sixth Circuit has recognized "an ongoing debate" in its own case law regarding "the circumstances under which a person responding to the arrival of police will raise suspicion of wrongdoing." *Johnson*, 620 F.3d at 695. That court has held that the speed of a suspect's movements may be relevant to the totality of the circumstances but that simply "walking away from

-10-

an officer does not create . . . reasonable suspicion." *United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011). The latter is simply "going about one's business" and is not suspicious conduct. *Johnson*, 620 F.3d at 695 (quotations omitted); *see also Florida v. Royer*, 460 U.S. 491, 498 (1983) (plurality) (stating that a person "need not answer any question put to him" by an officer and "may decline to listen to the questions at all and may go on his way").

Here, Mr. Briggs and his companion exhibited suspicious behavior; they did not simply go about their business. When the officers first turned onto 64th Street, Mr. Briggs and his companion "were walking at a normal pace." ROA, Vol. 2 at 36. They then changed direction and picked up their pace. According to Officer Pryce, one of them was nearly running and the other was "high-stepping, walking really, really fast." ROA, Vol. 2 at 36-37. Mr. Briggs repeatedly looked over his shoulder at the officers. This reaction would have heightened a reasonable officer's suspicion.

On the other hand, Mr. Briggs's movements and change of pace might not have been suspicious if the officers had not been readily identifiable as police. *See Edmonds*, 240 F.3d at 61 ("[F]urtive gestures are significant only if they were undertaken in response to police presence." (quotations omitted)). But the record shows that, although unmarked, the Dodge Charger was identifiable as a police vehicle. Officer Pryce testified that when the officers turned onto 64th Street, "it was basically, like, we saw them, they saw us, [and] that's when they changed directions." ROA, Vol. 2 at 36. It was objectively reasonable under the circumstances for the officers to conclude that the two

men changed course after spotting the unmarked, but identifiable, police car.

Mr. Briggs insists that he was merely walking away and that, for his movements to have been suspicious, he must have made "an 'obvious attempt[] to evade.'" Aplt. Br. at 14 (quoting *Brignoni-Ponce*, 422 U.S. at 885). He states that "[a]n obvious attempt to evade . . . would have been for him to bolt, which he did not do." *Id.*

"Bolting" from officers is not the only relevant and obvious form of evasion. A sudden change of direction upon seeing law enforcement, increased speed in an apparent attempt to create distance from the officers, and repeated glances over one's shoulder are circumstances that reasonably suggest evasion. Contrary to Mr. Briggs's depiction of events, the record suggests he was not merely walking away. Although this evidence may not alone establish reasonable suspicion, it moves the marker forward.

3. **Grabbing at waistline**

As the officers drove toward the men, Officer Cannon observed Mr. Briggs grabbing at his waistline. From his training and experience, Officer Cannon believed the hand movements indicated Mr. Briggs was carrying a concealed weapon. The district court discounted this observation, stating that "[t]his is not a case where the officer saw the outline of a gun" and that "Officer Cannon has conceded here that [Mr.] Briggs could possibly have been pulling up his pants." ROA, Vol. 2 at 68. To the extent the district court determined that this factor is irrelevant to the totality of the circumstances analysis, we disagree.

The Supreme Court has instructed that ambiguous conduct "susceptible of an

innocent explanation" may still heighten a reasonable officer's suspicion and justify a detention to resolve the ambiguity. *Wardlow*, 528 U.S. at 125 (discussing *Terry*, 392 U.S. at 5-6, 30). "Conduct that may be wholly innocent may nonetheless support a finding of reasonable suspicion in certain circumstances." *United States v. Johnson*, 364 F.3d 1185, 1192 (10th Cir. 2004); *see also Guardado*, 699 F.3d at 1225 ("Even conduct that is lawful, when observed through the prism of experience and considered in light of the circumstances, may warrant further investigation.").

Officer Cannon testified that Mr. Briggs "could have been" pulling up his pants. ROA, Vol. 2 at 26. But this concession was on cross-examination, after he testified that he saw Mr. Briggs "reaching for his waistline like he had a weapon there." *Id.* at 19. He further testified, based on his training and experience, that people who carry weapons often carry them at their waistline and that people who carry weapons illegally "tend to touch [the weapon] or grab for it when coming in contact with the police." *Id.* at 8.

Officer Cannon was not required to rule out the possibility that Mr. Briggs's hand movements were innocent. *See United States v. Patton*, 705 F.3d 734, 741 (7th Cir. 2013) ("[T]he reasonable suspicion standard does not demand that the possession of a weapon be the sole or most likely explanation for a suspect's behavior."). Given Officer Cannon's experience with individuals carrying weapons illegally, we must "defer to [his] ability . . . to distinguish between innocent and suspicious actions." *McHugh*, 639 F.3d at

1256.[4]

Mr. Briggs suggests that even if Officer Cannon suspected him of carrying a

firearm, "it is not against the law to have a concealed gun if you have a permit." Aplt.

Br. at 5. But weapons—guns, knives, or others—whether legally carried or not, can be

used for unlawful purposes. *See DeJear*, 552 F.3d at 1200 (holding that an officer had

---

[4] Moreover, this court recently recognized that a suspect's "grabbing his waistband in what appeared to be an effort to conceal some type of evidence . . . or retrieve a weapon" was probative of an officer's reasonable suspicion. *Guardado*, 699 F.3d at 1225 (quotations omitted). Other courts also have considered as relevant a suspect's hand movements toward his waistline or pockets. *See United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (concluding it was reasonable for officer to infer, based on his training and experience, that the defendant carried a gun in his waistband because he observed the defendant "adjust a weighty object concealed at the center of his waistline" and had observed similar movements when arresting other armed individuals); *United States v. Oglesby*, 597 F.3d 891, 895 (7th Cir. 2010) (holding that an officer reasonably believed that a defendant, who moved his hand toward his pocket, carried a weapon because "experience has shown that a subject who pats his waistband may be trying to confirm that his gun is concealed and secured"); *United States v. Dubose*, 579 F.3d 117, 122 (1st Cir. 2009) (holding it was reasonable for an officer to suspect a defendant was carrying a weapon when the defendant had his hand in his pocket and the officer "stated that drug dealers often carry weapons concealed in their waistbands . . . [and] often keep their hands in their pockets to ensure the gun does not fall down").

We acknowledge, however, that some courts have said hand movements were not relevant to the reasonable suspicion analysis. *See United States v. Jones*, 606 F.3d 964, 966-68 (8th Cir. 2010) (holding that, although it was a close question, clutching something in his sweatshirt pocket could not "justify a reasonable suspicion of criminal activity" because "[t]oo many people fit [that] description); *United States v. Wright*, 582 F.3d 199, 212 (1st Cir. 2009) ("[T]he fact that guns are frequently found in pockets (where else would they be?) does not provide support for an inference that Wright was carrying a weapon *as opposed to* something else that is frequently kept in pockets, such as keys."). These cases, however, involved officers' suspicion that a defendant had a weapon in a sweatshirt pocket. Common sense suggests that pockets are often used to carry all manner of items. The same cannot be said of a person's waistline.

-14-

reasonable suspicion to detain a defendant in a vehicle, in part because one passenger was "holding an object that could be used as a weapon—a baseball bat"); *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) ("Handguns are, of course, tools of the narcotics trade, and frequently the weapon of choice in robberies." (citation omitted)). We disagree with Mr. Briggs's suggestion that an officer observing an evasive suspect must disregard indications that the suspect is carrying a concealed weapon at his waistline merely because it is possible the suspect has a concealed-carry permit. Reasonable suspicion does not require the elimination of all innocent explanations for questionable behavior. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002). At the very least, in the circumstances facing the officers in this case, the presence of a concealed weapon would heighten reasonable suspicion that criminal activity was afoot.

In sum, the record establishes that Mr. Briggs's hand movements toward his waistline were relevant to the totality of the circumstances known to Officer Cannon at the time of the detention.

4. **Splitting paths**

The district court noted that, as the men turned onto Owasso Avenue and approached a home, they "split paths, . . . one went to the door of the house and the other, Mr. Briggs, kept going north" into the yard. ROA, Vol. 2 at 68. The court found this was "unusual and suspicious" but, as with the other factors, "in and of itself would not provide a lawful basis for an investigative detention." *Id.*

Mr. Briggs has not shown, or even argued, that the district court erred in

determining that it was suspicious and unusual that the men split paths as they approached the Owasso Avenue home. We accept the district court's view of the men's movements and factor it into the totality of the circumstances.

### 5. **Mr. Briggs's backpedaling**

After the officers parked outside the Owasso Avenue home and exited their vehicle, Officer Cannon asked the men to come over and talk with the officers. Mr. Briggs turned around but backpedaled away from the officers. The district court determined that Mr. Briggs exhibited nervous, evasive behavior that was "a pertinent factor in determining reasonable suspicion" but could not alone justify an investigative detention. ROA, Vol. 2 at 69.

Mr. Briggs does not dispute that he acted nervously. "[W]e have . . . made clear that nervousness, even if it may be a normal reaction, is still among the pertinent factors a reasonable law enforcement officer would analyze in investigating possible crimes, and should not be completely disregarded." *Johnson*, 364 F.3d at 1192; *see also McHugh*, 639 F.3d at 1258 ("It is well-settled that 'nervous, evasive behavior,' including fleeing from law enforcement, 'is a pertinent factor in determining reasonable suspicion.'" (quoting *Wardlow*, 528 U.S. at 124)). Nevertheless, "nervousness is of limited significance in determining reasonable suspicion." *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994). We consider Mr. Briggs's nervousness accordingly in our totality of the circumstances analysis.

As for Mr. Briggs's backpedaling away from the officers, we agree with the

district court that it is indicative of evasion and therefore is relevant. *See United States v. Salazar*, 609 F.3d 1059, 1067 (10th Cir. 2010) (concluding that defendants' "backing up" of a truck away from a police vehicle "could have suggested a nascent attempt to flee"); *see also Oglesby*, 597 F.3d at 894 ("There is nothing in the record to indicate any reason why a law-abiding person in [the defendant's] position would have cause to be nervous or back away from the officers.").

6. **Flight of Mr. Briggs's companion**

After the officers asked to speak with the men, Mr. Briggs's companion fled. The district court considered the companion's flight as part of its Fourth Amendment analysis. We agree that the flight of Mr. Briggs' companion would have heightened a reasonable officer's suspicion of criminal activity.

In *Wardlow*, the Supreme Court instructed that "evasive behavior is a pertinent factor in determining reasonable suspicion" and that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." 528 U.S. at 124. "Allowing officers confronted with . . . flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." *Id.* at 125.

But, unlike the defendant in *Wardlow*, Mr. Briggs did not flee; his companion did. Recently, in *United States v. De La Cruz*, 703 F.3d 1193 (10th Cir. 2013), this court stated that "[f]light can create reasonable suspicion that the *person fleeing* is involved in

-17-

criminal activity." *Id.* at 1198 (citing *Wardlow*, 528 U.S. at 121, 124-25). The Government argues *De La Cruz* is distinguishable from this case, and that it was reasonable for Officer Cannon to infer from the flight of Mr. Briggs's companion that Mr. Briggs was involved in criminal activity. We agree.

In *De La Cruz*, Immigration and Customs Enforcement ("ICE") agents conducted a sting in search of a man suspected of unlawful presence in the United States. *Id.* at 1194-95. They mistook the defendant, Mr. De La Cruz, as the suspect and stopped his vehicle at a truck wash. *Id.* at 1195. Mr. De La Cruz was dropping off his brother, Armando, for work. *Id.* When Mr. De La Cruz followed police orders to turn off and exit the vehicle, Armando fled and was apprehended. Mr. De La Cruz did not flee. *Id.*

It was "apparent" to one of the ICE agents that Mr. De La Cruz was not their suspect. *Id.* However, they continued to detain him and asked for his identification. *Id.* Mr. De La Cruz provided fake identification, and agents learned that he was in the country unlawfully. *Id.* He was arrested and indicted for unlawful reentry after a previous deportation. *Id.*

Mr. De La Cruz filed a motion to suppress. *Id.* He argued that his detention was initially constitutional because the agents believed he was their suspect, but that, after learning he was not the suspect, the agents exceeded the scope of the detention by asking for identification. *Id.* The district court denied his motion, and this court reversed.

We held that the extension of Mr. De La Cruz's detention was not justified by the initial belief that he was the desired suspect; the ICE agents quickly realized he was not

their man. *Id.* at 1196-97. The Government also argued that the continued detention of Mr. De La Cruz was justified because his brother had fled. *Id.* at 1198. We rejected that argument, noting that Mr. De La Cruz had not fled and that "[f]light can create reasonable suspicion that the *person fleeing* is involved in criminal activity." *Id.* We continued:

> One could imagine other circumstances where the flight of a passenger might create reasonable suspicion that the driver was also engaged in illegal activity. But this case does not present such circumstances. When the agents apprehended [the brother,] Armando, they discovered he was illegally in the United States. That is a status crime, which would not necessarily suggest that the driver of the vehicle from which he fled was also involved in criminal activity.

*Id.* at 1198. We further stated that the flight of a passenger "might engender reasonable suspicion" if there were additional circumstances—"for example, if the stop occurred close to the U.S.-Mexican border on a highway or road frequently used by illegal immigrants to enter the United States." *Id.* But the circumstances, "viewed objectively, suggested only that the driver was dropping off Armando to work at the truck wash." *Id.* at 1199.

*De La Cruz* does not apply here. That case involved a challenge to the scope of an investigative detention after agents had dispelled their suspicion that the defendant was the wanted suspect. The Government had the burden of proving that the continued detention was warranted, and we rejected the argument that the flight of another man who was engaged in a status crime was sufficient to suspect the defendant of wrongdoing where there were no other indicia of criminal activity. Moreover, this court was careful

-19-

in *De La Cruz* to leave open the possibility that a compatriot's flight could be a relevant factor.

Mr. Briggs was detained immediately upon the flight of his companion. Circumstances leading up to the companion's flight suggested that the two men acted in concert, including walking together, quickly changing direction upon seeing the police, and quickening their pace. Their joint reaction to the presence of law enforcement would suggest to a reasonable officer that any wrongdoing of one was likely shared by the other. Moreover, Mr. Briggs exhibited additional suspicious behavior by frequently looking over his shoulder, grabbing at his waistline, acting nervously and evasively when the officers asked to speak with the men, and backpedaling away from the officers. No such suspicious behavior occurred in *De La Cruz*.

A reasonable officer in Officer Cannon's position would not likely conclude that Mr. Briggs's failure to run indicated that he, unlike his companion, was not engaged in unlawful activity. The record establishes that the length of the police encounter with Mr. Briggs and his companion lasted only seconds. In addition, Mr. Briggs's detention appears to have been immediate upon the flight of the companion and upon Mr. Briggs's backpedaling away from the officers. The record, viewed in the light most favorable to the Government, does not suggest that Mr. Briggs consciously chose not to flee because he had nothing to hide. It suggests that there was little opportunity for him to do so given the rapidly evolving events.

*De La Cruz* acknowledged that "[o]ne could imagine . . . the flight of [another]

might create reasonable suspicion that the [defendant] was also engaged in criminal activity." *Id.* at 1198; *see also United States v. Johnson*, 496 A.2d 592, 597-98 (D.C. 1985) (concluding that a "driver's flight [from officers]. . . reflected the mind set and activity of those with whom he was associated under somewhat suspicious conditions" and, along with other circumstances, justified "a brief detention of the men still in the car"). We conclude this is such a situation and therefore consider the flight of Mr. Briggs's companion as relevant evidence that Mr. Briggs was involved in criminal activity.

7. **Totality of the circumstances**

Mr. Briggs argues that the foregoing facts were not enough to give rise to reasonable suspicion that he was engaged in criminal activity. He insists that Officer Cannon detained him based solely on a hunch, which is not a lawful basis for a detention. *See Terry*, 392 U.S. at 22 (stating that "constitutionally guaranteed rights" cannot be invaded based on "inarticulate hunches"). In support of his argument, he compares his detention to that in *United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996).

In *Davis*, police detained the defendant because he (1) had parked his car outside a known criminal establishment, (2) made and then broke eye contact with the officers and refused to stop when ordered, (3) had his hands in his pockets, and (4) had a criminal record that was known to the officers. *Id.* at 1468. We concluded that these facts, alone and together, did not give them a constitutional basis for detention. *Id.* at 1469-70. First, the business, while known to have illegal activities, also was known to have legal

activities inside.  *Id.* at 1468.  Second, a person may lawfully go on his way without engaging with police, and breaking eye contact furnishes no particularized suspicion of criminal conduct.  *Id.*  Third, the officers provided no particularized basis for concluding that because the defendant had his hands in his coat pockets on a December night, he was engaged in illegal conduct.  *Id.* at 1469.  Finally, knowledge of a suspect's criminal record is not alone a basis to stop and detain him.  *Id.*

Mr. Briggs's detention is distinguishable.  He exhibited evasive behavior by changing direction away from police, quickening his pace, and repeatedly looking over his shoulder.  He did not merely break eye contact and go casually on his way.  Mr. Briggs further exhibited nervousness upon contact with the officers by turning and backpedaling away from them.  The defendant in *Davis* did not exhibit such nervousness.  In contrast to *Davis*, where the defendant merely had his hands in his pockets, Mr. Briggs repeatedly reached toward his waistline, and Officer Cannon concluded, based on his training and experience, that these motions indicated Mr. Briggs was carrying a concealed weapon.  Finally, Mr. Briggs's companion fled after officers asked to speak with the men, a circumstance not present in *Davis*.

We agree with the district court that this is a close case.  Although the issue is fact-specific, we have concluded that reasonable suspicion justified an investigative detention in circumstances no more suspicious than these.  *See DeJear*, 552 F.3d at 1200-01 (holding reasonable suspicion existed where officers approached a parked car in a high-crime area, the defendant passenger was nervous and made furtive hand movements, and

another passenger had a baseball bat, which could be used as a weapon); *United States v. Gutierrez-Daniez*, 131 F.3d 939, 942-43 (10th Cir. 1997) (holding reasonable suspicion existed where defendant was in area known for heroin sales, he was "apparently soliciting a number of pedestrians," although it was possible "he was just panhandling," and he "appeared quite uneasy"). "Each case turns on its own facts," and there is no "minimum number of factors necessary to constitute reasonable suspicion." *Gutierrez-Daniez*, 131 F.3d at 942. Here, the specific and articulable facts known to Officer Cannon, as well as the rational inferences drawn from these facts, would give rise to a reasonable suspicion that Mr. Briggs had committed, or was committing, a crime. *See McHugh*, 639 F.3d at 1255.

None of the foregoing factors standing alone would likely justify detention. But together they provided a particularized, objective basis for concluding that criminal activity was afoot and that further investigation was warranted. *See Neff*, 681 F.3d at 1138 ("*Terry* itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation." (quotations omitted)). Instructing Mr. Briggs not to run during a rapidly developing situation involving evasion, flight, and the possible presence of a firearm was a reasonable, constitutional seizure.

## III. **CONCLUSION**

For the foregoing reasons, we affirm the district court's denial of Mr. Briggs's motion to suppress.