Filed 6/29/26  P. v. Harrington CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>VINCENT SHAWN HARRINGTON,<br><br>    Defendant and Appellant. | A172744<br><br>(City and County of San Francisco<br>Super. Ct. No. 24012603) |

A San Francisco police officer detained defendant Vincent Harrington because he was clutching at his waistline area and hunching over suspiciously in a neighborhood known for frequent shootings.  When Harrington moved his hands toward his sweatshirt pocket during the detention, the officer conducted a pat search and found a gun.  After a magistrate denied Harrington's motion to suppress the gun, he pled no contest to numerous firearm offenses.  On appeal, Harrington reprises his suppression claim, arguing that both the detention and the pat search were unlawful.  We affirm.

1

# BACKGROUND

Harrington was charged by complaint with (1) possession of a firearm by a felon (Pen. Code,[1] § 29800, subd. (a)(1)); (2) illegal possession or transportation of a machine gun (§ 32625, subd. (a)), carrying a loaded firearm (§ 25850, subd. (a)), carrying a concealed firearm (§ 25400, subd. (a)(2)), and possession of ammunition (§ 30305, subd. (a)(1)). The complaint further alleged several aggravating factors and that the offenses were committed while Harrington was on bail pursuant to section 12022.1, subdivision (b). Harrington filed a motion to suppress evidence under section 1538.5. The magistrate held a combined preliminary hearing and evidentiary hearing on Harrington's motion to suppress.

## I.

## Evidence at the Preliminary Hearing

Officer Chris Leong testified that on July 8, 2024, he was working under the Crime Gun Investigations Center (CGIC) of the San Francisco Police Department. Officer Leong had been a police officer for 18 years and received firearm training, including to identify concealed firearms. During the nearly three years Officer Leong had been assigned to the CGIC, he had participated in "well over dozens" of firearm abatement operations and made "over dozens" of firearm-related arrests. To spot concealed firearms, he testified that he was trained to look for "certain mannerisms," such as a subject "clutching [their] waistband," "walk[ing] with one arm . . . to hold [the firearm] in place," "manipulat[ing] anything, [in] areas where weapons or firearms typically are concealed" such as "hoodie pockets" and "front waistband areas." He also testified that "[t]ypically" a subject's "movement

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

towards the lower body area . . . usually [is] a sign for [him] that [the subject is] currently armed."

Around 7:27 p.m. on July 8, 2024, Officer Leong was on assignment with Sergeant Moran and another officer in an unmarked vehicle "doing violence suppression" in a neighborhood that Officer Leong knew had high gun violence. It was still daylight outside, and the officers were not responding to any shooting or known criminal activity at that time. Officer Leong heard Sergeant Moran announce that he was watching a person walking across the street while gripping his waistband and who Sergeant Moran believed was armed.[2]

"After [Sergeant] Moran made that comment, [Officer Leong] observed a subject wearing a black hoodie walking across the street holding on to his waistband area." The subject—later identified as Harrington—was wearing a black hooded sweatshirt with a large pocket on the front, and he was walking with two other men in the opposite direction of the officers' direction of travel. "At a certain point," Officer Leong observed Harrington "clutching his waistband" and "[m]omentarily" stop while "kind of like leaning forward, like, hunching over" before continuing to walk. Harrington did not continuously clutch at or keep his hand on his waistband, as Officer Leong also saw Harrington walk with both of his hands out and visible. Harrington looked at the officers' unmarked car as they drove by him.

Based on "[t]he fact that [Harrington] was holding his waistband area and leaning forward," Officer Leong believed Harrington was armed with a concealed firearm. Officer Leong never saw a bulge in Harrington's

---

[2] Defense counsel objected on hearsay grounds, which the magistrate overruled with the understanding that Officer Leong's testimony regarding Sergeant Moran's statement was not offered "for the truth of the matter, but to explain why [Officer Leong] did what he did."

3

waistband area.  Officer Leong did not state that he observed Harrington manipulate or grasp anything other than his waistband.

The driver of the officers' vehicle turned and stopped behind the men, and all three officers got out of the unmarked car.  None drew their firearms as they exited the vehicle and approached the three pedestrians.  While Officer Leong believed Harrington was armed, Officer Leong testified that he did not have his "firearm at the low ready" because he "did not believe it was in a threatening manner towards [him]."

Officer Leong ordered Harrington to put his hands up, and Harrington complied.  As Officer Leong approached Harrington, Officer Leong asked "what he just placed in his pocket," to which Harrington replied he had " 'nothing.' "  In the moment following his response, Harrington's hands dropped down to the level of the pocket area of his sweatshirt.  Officer Leong again ordered Harrington to put his hands up, which he obeyed.

Officer Leong then conducted a pat search on Harrington's front waistband area.  He felt the butt of a firearm, so he lifted Harrington's sweatshirt and pulled out a handgun with an auto sear switch.

## II.

### The Magistrate's Ruling

The magistrate denied the defense's motion to suppress, finding that Officer Leong conducted a lawful stop and a lawful search.  The magistrate began by stating that Officer Leong's observations of Harrington provided reasonable suspicion for a temporary detention, "whether . . . consider[ed] . . . in conjunction with [Sergeant] Moran's statement or not."  Specifically, the magistrate determined that Officer Leong's observation that "Harrington was clutching his waistband" "tilt[ed] in favor of denying the motion to suppress."

4

The magistrate emphasized that Sergeant Moran and Officer Leong's observations were "essentially the same" and "essentially consistent."

The magistrate also determined it was "fair to consider" that Officer Leong and his unit were conducting an operation with the "purpose . . . to arrest people or look for folks who were . . . concealing weapons." The magistrate further observed that Officer Leong stopped Harrington and not the other two men walking with Harrington, stating "there must have been something that caused Officer Leong to concern himself with [Harrington]."

Turning to the pat search, the magistrate said that "the fact that Mr. Harrington, after being told to put his hands up and did not do that and put his hand towards the area of his waistband, suggests to me that that gave the officer reasonable suspicion to pat search." The magistrate believed it was "a very close call," but it articulated two factors it found compelling: (1) Officer Leong's "explanations for why he decided to conduct the investigatory stop"; and (2) the absence of evidence showing that Officer Leong or his partners stopped or searched the two men Harrington was walking with. Accordingly, the magistrate held Harrington to answer.

## III.

## Later Proceedings

The prosecution filed an information charging Harrington with the same charges as in the complaint. Harrington moved to set aside the information pursuant to section 995, arguing the magistrate erred by denying his motion to suppress. The trial court denied the motion.

As part of a negotiated disposition, Harrington pled guilty to the charges and admitted the aggravating factor that he was armed with a weapon at the time of the offense. The trial court placed Harrington on formal probation for a period of two years. As a condition of probation, the

5

court ordered that Harrington serve one year in county jail with credit for time served. The court suspended imposition of sentence, stayed counts 2–5 pursuant to section 654, and dismissed the on-bail enhancement allegations. Harrington appealed.

## DISCUSSION

Harrington contends that Officer Leong lacked reasonable suspicion to detain him or to subsequently pat search him. We disagree.

### I.

### Standard of Review and Legal Principles

" 'On appeal from a section 995 review of the denial of a defendant's motion to suppress, we review the determination of the magistrate at the preliminary hearing.' " (*People v. Wallace* (2017) 15 Cal.App.5th 82, 88.) In doing so, we defer to the magistrate's factual findings, express or implied, when supported by substantial evidence, and we view the record in the light most favorable to the challenged ruling. (*People v. Smith* (2010) 190 Cal.App.4th 572, 576; *People v. Glaser* (1995) 11 Cal.4th 354, 362.) "We exercise our independent judgment to determine whether, on the facts found and those which are undisputed, the search and seizure was reasonable under the Fourth Amendment." (*Smith*, at p. 576.)

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." This right applies to brief investigatory stops and frisks. (*United States v. Cortez* (1981) 449 U.S. 411, 417 (*Cortez*); *Terry v. Ohio* (1968) 392 U.S. 1, 20.) "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained

6

may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231 (*Souza*); *Cortez, supra*, 449 U.S. at p. 417.) Similarly, the detaining officer may conduct a limited pat search for weapons only when articulable facts give rise to a reasonable suspicion that the subject is armed and dangerous. (*In re H.M.* (2008) 167 Cal.App.4th 136, 143; *Terry*, at p. 24.)

The reasonable suspicion standard is not susceptible to a bright line rule against which we can measure the reasonableness of a detention. (*Souza, supra*, 9 Cal.4th at p. 238.) The detaining officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch," ' " but the level of suspicion required is "less than is necessary for probable cause." (*United States v. Sokolow* (1989) 490 U.S. 1, 7 [defining probable cause as " 'a fair probability that contraband or evidence of a crime will be found' "].) " 'Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.' " (*Souza*, at p. 230.)

" 'The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible.' [Citation.] The first is that the assessment must be based on all of the circumstances, including objective observations, information from police reports, and 'consideration of the modes or patterns of operation of certain kinds of lawbreakers.' [Citation.] From

7

these data, the court said, a trained police officer could draw inferences "that might well elude an untrained person.'

" 'The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.' [Citation.] Stated another way, there must be 'some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.' " (*Souza, supra,* 9 Cal.4th at pp. 237–238, quoting *Cortez, supra,* 449 U.S. at p. 418.)

## II.

### The Investigatory Stop Was Lawful

Harrington argues that Officer Leong's observations of him gripping his waistband as he walked across the street and holding his waistband area as he bent over were too thin to justify an investigatory stop. We disagree because Officer Leong specified the salience of Harrington's mannerisms given his experience and expertise.

We first discuss the relevance of the factors considered by the magistrate to the Fourth Amendment inquiry. The magistrate expressly found: (1) Officer Leong observed Harrington "clutching his waistband"; (2) Officer Leong's unit's purpose included looking for individuals carrying concealed weapons; (3) Officer Leong did not indiscriminately detain all individuals when he stopped Harrington. Officer Leong's testimony supplies substantial evidence for those findings, and—based on the second articulated factor—we also find that the magistrate made implied findings that the detention occurred in a high-crime area and that Officer Leong was trained in

8

identifying concealed firearms based on an individual's mannerisms and manner of walking.[3]

A suspect's " [p]resence in an area of expected criminal activity' " is relevant to whether the totality of the circumstances justify a detention. (*People v. Flores* (2024) 15 Cal.5th 1032, 1044 (*Flores*).)  "But 'standing alone, [it] is not enough to support a reasonable, particularized suspicion that the person is committing a crime.' " (*Ibid.*; see *Brown v. Texas* (1979) 443 U.S. 47, 52 ["The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct"].)  Moreover, because "[t]he 'high crime area' factor is not an 'activity' of an individual" and is susceptible to abuse, courts must be cautious before concluding that "a location's crime rate transforms otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual." (*People v. Bower* (1979) 24 Cal.3d 638, 645, superseded by statute on other grounds as stated in *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733.)  With this in mind, Harrington's presence in an area known for gun violence is a relevant factor.

However, neither the "purpose" of Officer Leong's CGIC assignment nor the magistrate's finding that the officers did not detain the two individuals

---

[3] The magistrate also admitted Sergeant Moran's statement to Officer Leong that Harrington "was gripping his waistband," which it understood as not being offered for the truth of the matter asserted but "to explain why the officer did what he did."  However, the magistrate suggested the admissibility of Sergeant Moran's statements was academic because his observations were duplicative of Officer Leong's and Officer Leong had reasonable suspicion regardless of whether it considered Sergeant Moran's statement.  For the same reason, we need not resolve the admissibility of Sergeant Moran's statement either.

with Harrington are relevant here.[4]  Neither fact is an objective observation or an inference based on objective data from which Officer Leong could have developed reasonable suspicion that Harrington was engaged in criminal activity.  Moreover, the record shows that Officer Leong was in a high-crime area and was trained in identifying concealed firearms *because* of his CGIC assignment's purpose.  Therefore, considering his assignment's "purpose" would give those factors undue weight.

Officer Leong's observation that Harrington "clutch[ed] his waistband" is relevant to a reasonable officer's suspicion.  And Officer Leong observed more than Harrington merely touching his waistband; Officer Leong watched Harrington momentarily stop walking to bend or lean over while "holding his waistband area."  Such conduct is probative of an officer's reasonable suspicion when considered in light of the detaining officer's experience and training.  (See *United States v. Briggs* (10th Cir. 2013) 720 F.3d 1281, 1288–1289; *id.* at p. 1288, fn. 4, and cases cited; see also *People v. Montague* (N.Y. App.Div. 1991) 175 A.D.2d 54, 55 ["We can hardly ignore what is apparent to probably every police officer, that a handgun is often carried in the waistband"].)

A trained police officer may draw inferences " 'that might well elude an untrained person,' " but "the officer must articulate that experience and expertise as an objective circumstance justifying the detention." (*Flores*, *supra*, 15 Cal.5th at p. 1046.)  Officer Leong did so here.  First, Officer Leong testified to his classroom instruction and field experience, including his participation in "well over dozens" of firearm abatement operations and the

---

[4] Whether the magistrate erred in finding that the officers only detained Harrington was raised at the hearing on Harrington's motion to set aside the information.

"[n]umerous times" he had seen suspects grabbed their waistband before being apprehended for a firearm arrest.  Even more pointedly, Officer Leong articulated that a suspect "holding his waistband area and leaning forward" was a specific mannerism that he had seen before when the suspect was carrying a concealed firearm in their waistband area.  Thus, Officer Leong's training and experience explains the salience of Harrington's mannerisms.

We further observe that the transcript indicates that Officer Leong demonstrated how Harrington bent over and held his waistband area during his cross-examination and redirect.  From this we may infer that the magistrate made an implied finding that the demonstrated movement would heighten a reasonable officer's suspicion.  (See *People v. Harrington* (1970) 2 Cal.3d 991, 995–996 [superior court entitled to rely on magistrate's interpretation of defendant's gesture after magistrate asked the officer to demonstrate it].)

Based on the totality of the relevant factors, Officer Leong had reasonable suspicion to detain Harrington.  Specifically, it was objectively reasonable for Officer Leong to entertain a suspicion that Harrington was illegally carrying a concealed firearm considering:  (1) Harrington was in an area known for frequent shootings; (2) Harrington was clutching at his waistband and at one point held onto his waistband area while bending over; and (3) Harrington's mannerisms were typical of firearm concealment in light of Officer Leong's extensive training and experience.  Despite possible innocuous explanations for Harrington's mannerisms, it is well established that conduct consistent with criminal behavior supports reasonable suspicion to detain even if the conduct also is consistent with innocent behavior.  (*Souza, supra*, 9 Cal.4th at p. 233; see *Illinois v. Wardlow* (2000) 528 U.S. 119, 125 ["ambiguous" conduct "susceptible of an innocent explanation" may

11

still heighten a reasonable officer's suspicion and justify a detention to resolve the ambiguity]; see also *United States v. Briggs, supra*, 720 F.3d 1281, 1288, fn. 4 ["Common sense suggests that pockets are often used to carry all manner of items. The same cannot be said of a person's waistline"].) Therefore, the investigatory stop was legal.

We are not persuaded by Harrington's contention that Officer Leong's observations merely amounted to a "hunch." Harrington notes that Officer Leong testified that he did *not* see a bulge at Harrington's waistline and that Officer Leong did not testify one way or the other whether it appeared that Harrington manipulated or adjusted an object when he clutched at this waistline. While such observations would have supplied Officer Leong with more cause to be suspicious that Harrington was involved in criminal activity,[5] the absence of such evidence is not dispositive.

Nor are we persuaded that the present circumstances are analogous to those at issue in *Flores, supra*, 15 Cal.5th 1032. In *Flores*, the officers were on patrol at around 10:00 p.m. in an area considered to be a " 'known

---

[5] Many cases have held that an investigatory stop was justified, at least in part, on an officer's observation of a bulge at a suspect's waistline area (e.g., *Garcia v. Superior Court* (2009) 177 Cal.App.4th 803, 820–821 [magistrate could infer detention was lawful based on officer's observation of "four men, one a known gang associate holding a bulge at his waistband, walking together and then dispersing upon espying a police cruiser"]; *United States v. Bontemps* (9th Cir. 2020) 977 F.3d 909, 915 ["a bulge that appears to be a concealed firearm can form the basis for a *Terry* stop in a jurisdiction where carrying a concealed weapon is presumptively unlawful"]), of a suspect's manipulation of an unseen object (e.g., *United States v. Padilla* (2d Cir. 2008) 548 F.3d 179, 189 [lawful stop where defendant "adjust[ed] a weighty object concealed at the center of his waistline"]), or of the appearance that the suspect was holding a heavy object in his waistband (*People v. Lindsey* (2007) 148 Cal.App.4th 1390, 1393 ["it appeared there was something heavy in [suspect's] pocket or waistline" and his "hand was on his waistline for the entire time [the officer] observed him walking"]).

narcotic[s] area[ ]' and 'gang hangout.' " (*Id.* at p. 1038.)  The officers saw the defendant standing alone by a Nissan parked at a red curb.  (*Id.* at pp. 1038–1039.)  Upon seeing the officers, the defendant acted " 'suspiciously' " by trying to " 'conceal himself from the police' " and " 'pretending to tie his shoe.' " (*Id.* at p. 1039.)  Based on his behavior, the detaining officer believed the defendant was " 'loitering for the use or sale of narcotics.' " (*Ibid.*)  The California Supreme Court explained that the standard for suspicion justifying a " 'detention is not satisfied simply because a person's behavior is 'odd.' " (*Id.* at p. 1045.)  The court expounded:  "Notably, [the officer] did not see [defendant] engage in any conduct suggesting he was there to buy or sell drugs or was otherwise involved in illegal conduct." (*Ibid.*)  In the case at bar, by contrast, Officer Leong articulated that Harrington was "holding his waistband area and leaning forward" in a manner that indicated he was concealing a firearm based on Officer Leong's training and experience.

## III.

### The Pat Search Was Lawful

Even if the detention was lawful, Harrington contends Officer Leong lacked reasonable suspicion to conduct a pat search.  Again, we disagree.

"The 'sole justification' of the patsearch 'is the protection of the police officer and others nearby.' [Citation.]  Its purpose 'is not to discover evidence of crime, but to allow the officer to pursue his [or her] investigation without fear of violence.' " (*In re Jeremiah S.* (2019) 41 Cal.App.5th 299, 304.)  Thus, "the right to conduct a patdown search of a detained person requires a separate type of suspicion" than that required for an investigatory detention. (*People v. Parrott* (2017) 10 Cal.App.5th 485, 495.)

"The validity of a patsearch depends on the totality of the circumstances and turns on whether 'a reasonably prudent [person] in the

13

circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.' " (*In re Jeremiah S., supra,* 41 Cal.App.5th at p. 305.) "Considerations relevant to this inquiry typically include visible bulges or baggy clothing that suggest a hidden weapon; sudden movements or attempts to reach for an object that is not immediately visible; evasive and deceptive responses to an officer's questions about what the individual was doing; and unnatural hand postures that suggest an effort to conceal a weapon. [Citation.] Other relevant circumstances can include the type of crime at issue; the detained individual's suspected involvement in such a crime; and the searching officer's experience with such crimes and their associated weapon use in the particular location of the detention." (*Ibid.*)

After Harrington complied with Officer Leong's order to put his hands up, Officer Leong approached Harrington and asked what he had just placed in his pocket, to which Mr. Harrington responded: "Nothing." Then Harrington's hands quickly dropped, reaching the pocket area of his sweatshirt before Officer Leong again ordered Harrington to put his hands up.

These circumstances are enough for a reasonable prudent person to believe Harrington was armed *and* dangerous. Officer Leong already reasonably suspected Harrington was illegally carrying a concealed firearm, which is "an important fact in considering the totality of the circumstances" (*In re Jeremiah S., supra,* 41 Cal.App.5th at p. 307), and then Harrington suddenly moved his hands down toward the area where Officer Leong believed Harrington carried the firearm.[6]

---

[6] The magistrate did not mistakenly find that Harrington touched his waistband, as Harrington contends; rather it stated that Harrington "put his hand towards the area of his waistband," which is accurate.

14

Harrington's benign explanation that his action was a "reflexive, non-verbal cue used to reinforce his statement that he had not placed anything in his pocket" is unavailing. The standard is what a reasonably prudent person would believe under the circumstances. Nor is this a case where the officer frisked Harrington due to a "furtive gesture" indicative of hiding contraband, as Harrington suggests. Harrington's movement was in front of Officer Leong and, in the context of the Officer Leong's observations and experience, would give rise to a reasonable belief that Harrington was reaching for a weapon.

Harrington's authorities do not help him either. It is true that he did not repeatedly disobey an officer's orders, like the defendants in *People v. Lopez* (2014) 119 Cal.App.4th 132 and *In re Frank V.* (1991) 233 Cal.App.3d 1232. But that is not required to justify a pat search.

Harrington's reliance on *United States v. Elmore* (D. Mass. 2019) 382 F.Supp.3d 136 is also misplaced. There, the officers were investigating suspected gang shootings when they saw the defendant, "who had a prior firearm arrest and was a known affiliate of the suspected gang," walk away when the officers approached. (*Id.* at p. 141.) On those facts alone, the court held "[t]here was ample reasonable suspicion" to detain the defendant. (*Id.* at p. 142.) The officers further observed that the defendant "reached towards his waistband several times," acted nervously, and there was "a bulge in the front of [defendant's] pants." (*Ibid.*) The court held that "[t]hose observations, combined with [the officers'] training and experience and other known facts, provided *more than reasonable suspicion* to frisk defendant for a weapon . . . ." (*Ibid.*, italics added.) Thus, by its own terms, *Elmore* did not set the floor for determining reasonable suspicion to justify a pat search.

## DISPOSITION

The judgment is affirmed.

_____

Sweet, J.[*]

WE CONCUR:

_____

Brown, P. J.

_____

Goldman, J.

A172744/*People v. Harrington*

_____

[*] Judge of the Superior Court of California, County of Marin, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.