Filed 4/4/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JACKSON ARNOLD PARROTT,<br><br>    Defendant and Appellant. | A146642<br><br>(Humboldt County<br>Super. Ct. Nos. CR1500625<br>& CR15003328) |

**INTRODUCTION**

Jackson Arnold Parrott (appellant) appeals the judgment sentencing him to five years in state prison following his guilty plea to two charges of being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)), and his admission to two sentencing enhancements. The plea was part of a negotiated disposition of two pending criminal cases filed against him by the Humboldt County District Attorney. On appeal, appellant contends the trial court erred in denying his motion to suppress evidence on the ground that his Fourth Amendment rights were violated by an unlawful search and seizure resulting in the discovery of one of the firearms. We disagree, and affirm that ruling.

Appellant also contends he was deprived of his Sixth Amendment right to counsel at sentencing, requiring this case to be remanded to the trial court for resentencing. While we agree the record does not establish appellant properly waived his right to counsel and unequivocally invoked his right to self-representation under *Faretta*,[1] we

---

[1] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

1

conclude the error was harmless beyond a reasonable doubt. Therefore, we affirm the trial court's judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUNDS

### A. Case No. CR1500625

On February 9, 2015,[2] at approximately 8:29 p.m., two police officers were driving southbound on Pine Street in Eureka, California. As the officers approached the intersection of Pine Street and Wabash Avenue, they observed a small purple hatchback vehicle without illuminated rear or brake lights, rolling backwards toward the intersection. Not knowing if there was a driver in the vehicle, the officers positioned their patrol car behind the hatchback vehicle to keep it from rolling further down the street. Seconds later the vehicle came to a stop, appellant exited from the driver's side of the vehicle and proceeded to push it to a nearby curb.

Officer Harkness exited his patrol car and contacted appellant as he began to lift the hood of his vehicle. The officer asked if he could assist appellant with his disabled vehicle, offering a tow truck or a ride to someone who could repair the car, but appellant replied "that he didn't really need any assistance." Appellant was wearing a hooded sweatshirt, with a visibly heavy item bulging from the front pocket. As the interaction progressed, the officer noticed appellant appeared nervous and continued to touch the bulging item in the front pocket of his sweatshirt.

Eventually, Officer Harkness asked appellant to step out of the roadway and onto the sidewalk. When on the sidewalk, Harkness asked for appellant's name and date of birth. Appellant provided the information, nervously adding that he was not on probation or parole. The officers then reported appellant's name to dispatch. Appellant continued to appear nervous, answering questions rapidly and continuously, while looking from one officer to the other in "really quick, targety glances." At one point, Harkness asked appellant to refrain from reaching into the front pocket of his sweatshirt, fearing it might

---

[2] All subsequent unspecified date references in this opinion are to the year 2015.

2

contain a weapon. Appellant also asked the officers if he could smoke a cigarette, and Harkness responded by stating "there was no reason that he couldn't smoke a cigarette."

After a few minutes, dispatch informed the officers that appellant's license was suspended. After learning of appellant's suspended license, Officer Harkness "took hold of" appellant's right arm and told him to put his hands behind his back. When appellant resisted, the officers took a firm grip on him to prevent him from moving or reaching into his front pocket. Appellant was once again told to place his hands behind his back. After appellant refused to cooperate a second time, the officers subdued him, placed him on his stomach and handcuffed him. Officer Soltow patsearched appellant, felt what he believed to be a gun, and reached into appellant's front sweatshirt pocket, finding a loaded handgun.

After appellant waived a preliminary hearing in Case No. CR1500625, the Humboldt County District Attorney filed an information on February 27, 2015, charging appellant with possession of a firearm by a felon (Pen. Code, § 29800, subd. (a); count one) and driving without a valid driver's license (Veh. Code, § 12500, subd. (a); count two.) In connection with count one, the information also alleged a prior strike (Pen. Code, § 667, subds. (b)-(i)), and a prior prison term (Pen. Code, § 667.5).

As we discuss more fully below, on May 26, appellant filed a motion to suppress evidence (Pen. Code § 1538.5). On July 1, the trial court denied that motion.

**B. Case No. CR1503328**

On July 17, a Eureka police officer contacted appellant, who was sitting in a vehicle located in the parking lot of a local mall. After discovering that appellant had an outstanding warrant, the officer arrested appellant, subsequently searched the area within appellant's control, and found a loaded firearm under the driver's seat.

After appellant waived a preliminary hearing in Case No. CR1503328, the Humboldt County District Attorney filed an information on August 12, charging appellant with possession of a firearm by a felon (Pen. Code, § 29800, subd. (a); count one) and possession of ammunition (Pen. Code, § 30305, subd. (a)(1); count two). In connection with both counts, the information also alleged appellant was on bail during

the commission of the offenses (Pen. Code, § 12022.1), and had a prior strike (Pen. Code. § 667, subds. (b)-(i)) and a prior prison term (Pen. Code, § 667.5).

On September 9, the two informations were consolidated for trial purposes.

## C. Change of Plea Hearing

On September 14, pursuant to a negotiated disposition, appellant pled guilty to count one in Case No. CR1500625, count one in Case No. CR1503328, and admitted to one strike prior and one prison prior. In return for the plea, it was agreed that appellant would be sentenced to five years in state prison calculated as follows: The mid-term of two years for count one in Case No. CR1500625, doubled for the admitted prior strike and one additional year based on the admitted prior prison term. A two-year term would also be imposed to run concurrent based on the guilty plea to count one in Case No. CR1503328. All other counts and enhancements were to be dismissed by the prosecution. After admonishments to and waivers by appellant, the court approved the change of plea, and the remaining counts were dismissed. Appellant was represented at the change of plea hearing by attorney Michael P. Acosta, who had been retained by appellant as of April 9.

## D. Sentencing Hearing

At the time of appellant's October 7 sentencing hearing, Mr. Acosta could not be located in or around the courthouse and could not be reached by telephone. The trial court then stated, "Mr. Parrott, I just had the clerk provide you with a copy of the probation report that was received on October 1st, 2015. If you would like to have a day or two to review that, you certainly may have that. You're entitled to that. Or—," to which appellant replied, "He can be my lawyer at this point. Let's just go." The court responded, "Okay. If you would like to at this point, essentially, represent yourself for sentencing, you can do that as well. I think we all agreed what's going to happen." Appellant states, "Yeah, I'm ready. Let's rol[l]."

The court then asked, "So you're waiving Mr. Acosta's personal presence?" Appellant responded, "Yeah." The court confirmed by stating, "Yes?" and appellant reiterated, "Yeah." The court continued, "Thank you. So, Mr. Parrott, is there any

4

reason we should not proceed with sentencing today?" and appellant replied, "No." The court stated its understanding of the agreed upon disposition and asked appellant if there was anything he would like to say before they proceeded to sentencing. Appellant answered, "No. I'm good," and the court proceeded to sentence appellant to state prison for a total of five years consistent with the terms of the negotiated disposition.

Appellant filed a timely notice of appeal on October 10.

## III.

## DISCUSSION

### A.  Motion to Suppress Evidence

The standard for appellate review on a motion to suppress is well established. The appellate court reviews the trial court's findings of historical fact under the deferential substantial evidence standard, but decides the ultimate constitutional question independently. Selection of the applicable law is a mixed question of law and fact that is subject to independent review. (*People v. Gonzalez and Soliz* (2011) 52 Cal.4th 254, 284; *People v. Glaser* (1995) 11 Cal.4th 354, 362.)

In the present case, appellant contends the trial court erred in denying his motion to suppress evidence. He asserts that his Fourth Amendment rights were violated when officers detained him without having the requisite reasonable suspicion to believe appellant was involved in criminal activity. For this reason, appellant argues the evidence obtained as a result of the constitutional violation should be inadmissible fruit of the antecedent illegal search and seizure.

Appellant's contention requires the court to answer two questions: (1) at what point in the encounter was appellant detained, and (2) did the officers have the proper level of suspicion to justify a detention and patdown search?

The Fourth Amendment to the United States Constitution provides that individuals are entitled "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." (U.S. Const., 4th Amend.) Although this amendment restricts only the federal Government, the "right of privacy" also extends to

protect against state action through the due process clause of the Fourteenth Amendment. (*Mapp v. Ohio* (1961) 367 U.S. 643, 655.)

Within the meaning of the Fourth Amendment, an individual is detained when police officers restrain his or her liberty by means of physical force or show of authority. (*California v. Hodari D.* (1991) 499 U.S. 621, 626; *United States v. Mendenhall* (1980) 446 U.S. 544, 554.) The test for whether a police officer's conduct amounts to a detention is whether the officer's conduct would indicate to a reasonable person that he or she is not free to leave, or otherwise to terminate the encounter. (*United States v. Mendenhall*, at p. 554.)

A consensual encounter between a police officer and an individual does not amount to a detainment under the Fourth Amendment. "It is well established that law enforcement officers may approach someone on the street or in another public place and converse if the person is willing to do so" without having any "articulable suspicion of criminal activity. [Citations.]" (*People v. Rivera* (2007) 41 Cal.4th 304, 309.) For example, " 'law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.' " (*Florida v. Bostick* (1991) 501 U.S. 429, 434, quoting *Florida v. Royer* (1983) 460 U.S. 491, 497.) There is no Fourth Amendment violation as long as a reasonable person, under the circumstances, would feel free to leave, or to end the encounter. (*People v. Rivera*, at p. 309.)

In determining whether a reasonable person would have believed he or she was free to leave or end the encounter, a court must take into account the totality of the circumstances from the perspective of a reasonable person in the defendant's position. (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) In doing so, the court "assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.]" (*Ibid.*) Relevant factors include "the presence of several officers, an officer's display of a weapon, some physical touching of the person,

6

or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled.  [Citations.]" (*Ibid.*)

With regard to this question, the parties agree the interaction on February 9 between appellant and the officers initially began as a consensual encounter, and eventually became a temporary detention.  Appellant contends he was detained when officers asked him to keep his hands out of his pockets and to step onto the sidewalk.  We disagree.

When Officer Harkness initially contacted appellant, he did so to inquire about appellant's disabled vehicle and to offer assistance.  A reasonable person in appellant's position would have realized that, by offering him a tow truck or a ride to someone who could repair the car, Officer Harkness was attempting to help appellant get out of his predicament.  There are no facts in the record indicating the initial interaction was anything more than a consensual encounter, or that the officer was investigating criminal behavior.

As the interaction progressed, Officer Harkness asked appellant to refrain from placing his hands in his pockets and to provide his name and date of birth.  Appellant argues that, considering the totality of the circumstances, these requests constituted a show of authority that indicated to appellant "an investigation was being focused on him."  As a result, appellant argues that when Harkness proceeded to ask him to step onto the sidewalk, the encounter became a detention because a reasonable person who was suspected of unlawful activity would not feel free to end the encounter.  Appellant's argument is based on the decision in *In re J.G.* (2014) 228 Cal.App.4th 402, 413 (*J.G.*), where the court held that an officer detained two individuals when he requested that they sit on a curb and conveyed to them that he suspected them of unlawful activity.  We find this case to be factually distinguishable.

First, directing an individual to sit on a curb is not similar to asking someone to step onto the sidewalk to avoid a potential safety risk of having a conversation on a road.  A reasonable person in appellant's position would have realized that the officers asked

7

him to move onto the sidewalk to ensure his and their safety during their continuing conversation.

Second, in *J.G.*, prior to being asked to sit on the curb, detained individuals had already been asked for physical identification, they had been asked if they had anything illegal on their person, they both had been physically searched, and the individuals were questioned by four uniformed officers. (*In re J.G.*, *supra*, 228 Cal.App.4th at p. 406.) In contrast, here, appellant was only asked for verbal identification, he was primarily questioned by one officer, and he was not asked about being involved in any illegal activity.

Third, asking an individual to keep his hands out of his pockets is not akin to conveying to an individual that they are suspected of being involved in unlawful activity. Rather, asking appellant to keep his hands out of his pockets is a normal, expected response to an officer's concern for his or her own personal safety during the encounter. Furthermore, prior to being asked to move onto the sidewalk, there was no application of force, no brandishing of weapons and no blocking of exits. Finally, even after the parties moved onto the sidewalk appellant asked the officers if he could smoke a cigarette, and one of the officers responded by stating "there was no reason that he couldn't smoke a cigarette."

For these reasons, the officers' requests were not a display of authority. The encounter did not amount to a detention until the officers used physical force to grab appellant's arm and told him to place his hands behind his back.

Regarding the second issue, appellant contends the officers lacked the requisite level of suspicion necessary to justify detaining him. Again, we disagree.

Within the meaning of the Fourth Amendment, a police officer may temporarily detain an individual if the officer has "reasonable suspicion" to believe the individual is involved in criminal activity. (*In re Tony C*. (1978) 21 Cal.3d 888, 894.) Reasonable suspicion is defined as " a particularized and objective basis' " for suspecting a person is involved in criminal activity. (*Ornelas v. United States* (1996) 517 U.S. 690, 696.) In determining the existence of reasonable suspicion, officers may "draw on their own

experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' [Citation.]" (*United States v. Arvizu* (2002) 534 U.S. 266, 273.)

In the present case, the trial court correctly found that, at the time appellant was detained, there was reasonable suspicion to believe appellant had committed a Vehicle Code violation. Vehicle Code section 12500, subdivision (a), provides that a person may not drive a motor vehicle upon a highway without a valid driver's license. (Veh. Code, § 12500, subd. (a).)

However, appellant maintains the officers lacked reasonable suspicion to believe he had violated the Vehicle Code based on the fact that although officers learned from dispatch that his license was suspended, the officers never physically saw appellant driving the car. In addition, appellant contends his nervousness and the unidentifiable bulge in his front pocket were not enough to provide the officers with reasonable suspicion he was engaged in criminal activity.

We conclude that under the circumstances, the officers did have an objectively reasonable basis for suspecting appellant had committed a Vehicle Code violation. Although the officers did not see appellant driving the car, the officers did observe the car rolling backwards, and saw appellant exit from the *driver's side* and attempt to jumpstart the car. As a result, it was reasonable for the officers to infer that appellant had driven the car, but lost control when the car stopped and rolled backwards into the intersection. Therefore, when dispatch informed the officers that appellant's license was suspended, the officers had the requisite reasonable suspicion to detain him.

However, the right to conduct a patdown search of a detained person requires a separate type of suspicion. A detained person may be searched "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." (*Terry v. Ohio* (1968) 392 U.S. 1, 24.) In this regard, an officer may conduct a patdown search to determine whether the detained person is in fact carrying a weapon. (*Ibid*.)

9

Appellant argues that this was not the type of encounter in which one would expect a person to be armed and dangerous, or in which a bulge in a pocket is likely to be a weapon, because it was not a high crime area and the officers only contacted appellant to help with his disabled car. However, a police officer has a strong need to practice caution and self-protection when on patrol. Here, officers noticed a heavy item bulging in appellant's front pocket, which appellant touched several times during their encounter. The patdown did not begin until it was confirmed that appellant did not have a valid driver's license, and only after he physically resisted two attempts by the officers to handcuff him. Given these circumstances and the struggle that ensued, the officers justifiably feared that appellant was armed, and thus the patdown search was a lawful search under the Fourth Amendment. Accordingly, we affirm the lower court's ruling to deny the appellant's motion to suppress evidence.

## B. Motion to Remand for Resentencing

Appellant also contends that he was denied his Sixth Amendment right to counsel at his sentencing hearing. He argues this violation of his right to counsel resulted in structural error that requires a remand to the trial court for resentencing.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." (U.S. Const., 6th Amend.) In addition, it is well established that a criminal defendant has a constitutional right to counsel at all critical stages of a criminal prosecution, including sentencing. (*People v. Doolin* (2009) 45 Cal.4th 390, 453.) Sentencing is considered a critical stage of a criminal proceeding, within the meaning of the Sixth Amendment. (*Ibid*.; *Mempa v. Rhay* (1967) 389 U.S. 128, 134-137.)

A defendant in a criminal proceeding may waive his constitutional right to counsel if he wishes to represent himself at trial. (*Faretta*, *supra*, 422 U.S. at p. 835.) However, when a defendant waives his right to counsel, a defendant must do so " 'knowingly and intelligently.' " (*Ibid*.) The Supreme Court in *Faretta* instructed that a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.

[Citation.]" (*Ibid*.) The test for a valid waiver of counsel "is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. [Citations.]" (*People v. Bloom* (1989) 48 Cal.3d 1194, 1225.)

In admonishing a criminal defendant about self-representation, the California Supreme Court has held it is insufficient for a trial court simply to advise the defendant only of the benefits of self-representation, and not of its disadvantages. For example, in *People v. Burgener* (2009) 46 Cal.4th 231, a trial court granted the defendant's request to represent himself at sentencing without first informing the defendant of the disadvantages of doing so. (*Id*. at p. 239.) The court based its decision not to provide adequate *Faretta* warnings on the assumption that the defendant was "fully aware" of his case because he was the only person who sat through all of the hearings and motions. (*People v. Burgener*, at p. 239.) In response, the Supreme Court held that "[i]nforming a defendant that self-representation means a waiver of counsel is not an advisement of the associated dangers and disadvantages; it is merely a rephrasing of the defendant's choice. [Citations.]" (*Id*. at p. 243.)

Furthermore, a *Faretta* request for self-representation must be unequivocal. With regard to whether a *Faretta* request is equivocal, courts must determine "whether the defendant truly desires to represent himself or herself." (*People v. Marshall* (1997) 15 Cal.4th 1, 23.) Thus, "an insincere request or one made under the cloud of emotion may be denied." (*Id*. at p. 21.) As our Supreme Court explained in *Marshall*, "the court's duty goes beyond determining that some of [the] defendant's words amount to a motion for self-representation. The court should evaluate all of a defendant's words and conduct to decide whether he or she truly wishes to give up the right to counsel and represent himself or herself and unequivocally has made that clear." (*Id*. at pp. 25-26; see *People v. Tena* (2007) 156 Cal.App.4th 598, 607.)

In the present case, appellant attended his sentencing hearing, but his retained counsel did not. The trial court informed appellant that his attorney could not be located,

and provided him with a copy of the probation report that was received on October 1. The court then stated, "If you would like to have a day or two to review that, you certainly may have that. You're entitled to that. Or—." However, appellant interrupted and stated, "He can be my lawyer at this point. Let's just go." The court then responded, "Okay. If you would like to at this point, essentially, represent yourself for sentencing, you can do that as well. I think we all agreed what's going to happen." Appellant responded by stating, "Yeah, I'm ready. Let's rol[l]."

Initially we note that appellant stating, "He can be my lawyer at this point. Let's just go," was not an invocation of his *Faretta* right to self-representation. Although it is unclear who was the "he" to whom appellant was referring, it is likely that rather than self-representation, appellant was suggesting that the court might assign to him a different attorney in the absence of his retained counsel.

Almost immediately, and in response to this vague reference by appellant, the trial court stated, "[o]kay. If you would like to at this point, essentially, represent yourself for sentencing, you can do that as well. I think we all agreed what's going to happen." Once the suggested alternative of self-representation was broached by the trial judge, there is no question that appellant expressed his desire to proceed with sentencing without counsel. However, it is not clear from the record whether appellant made this choice out of an unequivocal desire to do so, or because it had become clear that the matter could not proceed that day if he insisted on waiting for Mr. Acosta's availability, or the appointment of substitute counsel. As a result, we cannot conclude that this interaction between the trial court and the appellant constituted a waiver of counsel, and was an unequivocal invocation of appellant's *Faretta* right of self-representation, particularly given our Supreme Court directives to lower courts that caution be exercised in considering such matters.

Although we conclude the record does not support a waiver of counsel and an unequivocal invocation of appellant's right to self-representation, we must also determine whether reversal is mandated because such a violation of appellant's right is structural error, or instead subject to harmless error analysis.

12

Since the landmark decision in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*), it has been well established that a constitutional error does not automatically require a reversal of a conviction. In *Chapman*, the court stated "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." (*Id*. at p. 22.)

The types of constitutional violations that may occur during a criminal proceeding, either at trial or sentencing, are divided into two categories. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 307-310.) The first category consists of " 'trial error,' " which "may . . . be quantitatively assessed in the context of other evidence presented" and is subject to harmless-error analysis. (*Id*. at pp. 307-308.) The second consists of "structural defects," which "affec[t] the framework within which the trial proceeds," and require automatic reversal. (*Id*. at p. 310.) Typically, there is a "strong presumption" that any error will typically fall into the trial error category. (*Rose v. Clark* (1986) 478 U.S. 570, 579.)

Since *Chapman*, California intermediate appellate courts have remained divided on whether a *Faretta* violation, specifically, the failure to provide warnings regarding the pitfalls of self-representation, requires automatic reversal. For example, in *People v. Hall* (1990) 218 Cal.App.3d 1102, 1108-1109, and *People v. Lopez* (1977) 71 Cal.App.3d 568, 571, the reviewing courts concluded that the failure to warn the defendants regarding the dangers and disadvantages of self-representation before granting defendants' requests to represent themselves was prejudicial per se. On the other hand, *People v. Cervantes* (1978) 87 Cal.App.3d 281, 291-294 (*Cervantes*), and *People v. Wilder* (1995) 35 Cal.App.4th 489, 502 (*Wilder*) concluded that the harmless beyond a reasonable doubt standard in *Chapman* applies to this analysis.

In *Cervantes*, the defendant moved to represent himself after he had been represented by a public defender. In making the request, he acknowledged that he understood the charges against him, stated that he had completed two years of college, and accepted the trial court's warning that he would be accorded no special privileges and

would be treated the same as if he had counsel.  (*Cervantes*, *supra*, 87 Cal.App.3d at p. 286, fn. 1.)  The court reasoned, "We perceive a signal difference between a case where an indigent was not advised at the time of trial on the merits that he could have an attorney appointed by the court at public expense and did not waive his right to counsel as in *In re Smiley* (1967) 66 Cal.2d 606 . . . , which requires a reversal per se and one where defendant, as in the instant case, was fully aware of his right to counsel, requested to represent himself pursuant to *Faretta* and in fact was granted self-representation but which was predicated on an insufficient record with respect to a warning of the pitfalls involved in self-representation as mentioned in *Faretta*."  (*Cervantes*, at p. 292.)

In *Wilder*, the trial court offered the defendant a state-appointed public defender, but the defendant affirmatively rejected the attorney and requested to represent himself. (*Wilder*, *supra*, 35 Cal.App.4th at pp. 493-494.)  The trial court granted the defendant's request, but failed to advise him of the potential dangers of self-representation.  (*Ibid*.) For that reason, the defendant argued that the trial court failed to provide him with *Faretta* warnings in violation of his Sixth Amendment right.  (*Id*. at p. 494.) Nevertheless, the appellate court found that even if the defendant had been provided with the proper *Faretta* warnings, defendant still would have chosen self-representation because he rejected the lawyer that was initially appointed to represent him.  (*Id*. at p. 502.)  As a result, the error was harmless beyond a reasonable doubt because nothing would have changed had the defendant been advised of the dangers of self-representation.

Recently, this division followed *Cervantes* in deciding that while the *denial* of a *Faretta* motion is structural error, the harmless beyond a reasonable doubt standard, and not the per se reversal rule, should be applied in determining if deficiencies in the trial court's admonitions when *granting* a *Faretta* request were prejudicial.  (*People v. Bush* (2017) 7 Cal.App.5th 457 (*Bush*).)  In distinguishing between the two, we noted: "It seems to us that if an erroneous denial of a self-representation request—where the issue of defendant's knowledge or understanding is a close question—is reversible per se, and if the erroneous granting of such a request—where the admonition is incomplete rather than completely absent—is also reversible per se, the trial court is left with the narrowest

14

of channels along which to navigate the shoals of possible error. (See, e.g., *People v. Cervantes*[, *supra*] 87 Cal.App.3d [at p.] 287 . . . [In this context, courts must navigate ' "between the Scylla of denying a defendant the right to determine his own fate and the Charybdis of violating his right to counsel by acceptance of an ineffectual waiver" '], disapproved on another ground in *People v. Barnum* (2003) 29 Cal.4th 1210, 1219, fn. 1, 1222–1225 . . . .)" (*Bush*, at p. 476, italics omitted.)

We will follow our recent decision in *Bush*, and in applying the harmless beyond a reasonable doubt standard of prejudice we conclude that any deficiency in the court's admonition here was indeed harmless. In reaching this conclusion, we note that appellant's briefs on appeal offer no suggestion of what disadvantages of self-representation the trial court should have conveyed to appellant under the circumstances. We can offer none ourselves.

The sentencing was simply a process to put on the record a previously negotiated plea disposition supervised and approved by the same judge who presided at sentencing. At the hearing on September 14, appellant was represented by counsel, admonished and waived his *Boykin-Tahl* rights,[3] and the terms of the plea were placed on the record, including that appellant would receive a five-year aggregate state prison sentence.[4] At the same time, appellant's counsel acknowledged that he had explained the elements of the charges, and any defenses he may have had to the charges. Counsel also stated that he discussed the consequences of the plea with appellant, and that appellant understood them.

---

[3] *Boykin v. Alabama* (1969) 395 U.S. 238 (*Boykin* ); *In re Tahl* (1969) 1 Cal.3d 122 (*Tahl*).

[4] It is also noteworthy that, absent a plea disposition, appellant faced a total aggregate state prison sentence of eight years four months, and it appears that at the commencement of the September 14 plea hearing the parties discussed whether the plea was to be "open" with the court deciding on the length of sentence at the time of sentencing. However, after a short recess in the proceeding, the parties confirmed that appellant's plea would include a five-year state prison cap.

15

The presentence report by the probation department included an interview with appellant in which he admitted having possession of the weapon "for his own protection." At the same time, appellant acknowledged that he understood the terms of the conditional plea to which he agreed and that he was "resigned to the fact that he will be serving time in state prison." The report also noted that under Penal Code section 1203, subdivision (e)(4), appellant otherwise was not eligible for a grant of probation except in unusual cases, and there appeared to be no such unusual circumstances that would have made him probation eligible. In conclusion, the report recited the terms of the negotiated plea (which were the same as those stated on the record in open court at the September 14 hearing), and recommended that the sentence follow those terms.

Given these circumstances, we can envision nothing the presence of counsel at the sentencing hearing could have contributed, and conversely, there was no prejudice whatsoever to appellant caused by counsel's absence. Reducing the sentence agreed to as part of the negotiated disposition was not possible. This fact is reminiscent of *U.S. v. Salemo* (3d Cir. 1995) 61 F.3d 214, where the concurring judge noted: "Such a blanket rule [of prejudice per se] could produce some strange results. For example, suppose that a defendant does not validly waive counsel at sentencing but is given the mandatory minimum sentence prescribed by statute. . . . In this case, must the sentence to be vacated and the case remanded so that the very same sentence can be imposed with counsel present?" (*Id*. at p. 223, fn. 1; see also *Bush*, *supra*, 7 Cal.App.5th at p. 476.)

Therefore, we conclude beyond a reasonable doubt that any error in the trial court proceeding to enter sentence and judgment on October 7 was harmless.

## III.

## DISPOSITION

The sentence and judgment are affirmed.

16

                               _____

                               RUVOLO, P. J.

We concur:

_____

REARDON, J.

_____

RIVERA, J.

A146642, *People v. Parrott*

Trial Court:                          Humboldt County Superior Court

Trial Judge:                         Hon. John T. Feeney

Counsel for Appellant:          Roberta Simon, by appointment of the
Court of Appeal under the First District
Appellate Project Independent Case System

Counsel for Respondent:        Kamala D. Harris
Attorney General of California

Gerald A. Engler
Chief Assistant Attorney General

Jeffrey M. Laurence
Senior Assistant Attorney General

Eric D. Share
Supervising Deputy Attorney General

Ronald E. Niver
Deputy Attorney General

A146642, *People v. Parrott*