Filed 6/16/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OMAR J. KASRAWI,<br><br>    Defendant and Appellant. | D077139<br><br><br><br>(Super. Ct. No. SCD281382) |

APPEAL from an order and judgment of the Superior Court of San Diego County, David M. Gill and Frederick L. Link, Judges.  Affirmed.

Russell Sheridan Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Omar Kasrawi was apprehended in an affluent neighborhood in possession of property he had stolen from some nearby cars. Although the officer who stopped and ultimately arrested him acted on no more than a hunch, detaining Kasrawi after watching him innocuously cross the street to his legally parked car, he subsequently learned that Kasrawi had an outstanding arrest warrant. Supreme Court precedent compels our conclusion that despite the Fourth Amendment violation, the evidence need not be suppressed. This case falls into a narrow exception to the exclusionary rule that applies where a law enforcement officer discovers the defendant's outstanding warrant after an illegal stop but before a search yields evidence of a crime. Under these limited circumstances, discovery of the warrant can attenuate the taint of the original detention.

On these grounds, we affirm the denial of Kasrawi's suppression motion. We also conclude that Kasrawi's later and unrelated theft of property from a car in a condominium guest parking garage was properly deemed a residential burglary. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On an April morning around 4:00 a.m., San Diego Police Officer John Pardue was driving his regular patrol route in Del Mar when he saw Kasrawi cross a residential street and begin to enter his Toyota Prius. Because Pardue rarely saw people during his nighttime patrol, knew of two car burglaries in the area in the past week, and did not recognize that particular Prius, his interest was piqued. In addition to his patrol car headlights, which had already provided enough illumination for Pardue to see Kasrawi crossing the street, Pardue flipped on his spotlight and pulled up behind and to the

2

side of the Prius, flooding Kasrawi with a bright light. Pardue's Body Worn Camera (BWC) captured most of the encounter.[1]

Kasrawi stopped getting into his car and turned to face Pardue, who immediately exited his patrol car, walked around to the front, and stopped a few feet away as he asked Kasrawi where he was coming from. Kasrawi responded that he was resting on a drive down from Los Angeles—an answer Pardue found unsatisfying because the residential street was several turns away from Interstate 5. Pardue suspected that Kasrawi was actually casing vehicles. He directed Kasrawi to take a seat on the front bumper of the patrol car and informed him that he was being detained as he secured handcuffs to his wrists. This whole exchange, from the time Pardue parked his car to when he handcuffed Kasrawi, took about fifteen seconds.

After learning that Kasrawi had a warrant, Pardue placed him under arrest. A subsequent search incident to arrest yielded stolen items from nearby cars in Kasrawi's pockets and his Prius, from fistfuls of loose change to gift cards and purses. At some point after his arrest, Kasrawi attempted to discard a bindle of methamphetamine, but an officer who arrived to help Pardue noticed when Kasrawi dropped the small package.

Kasrawi was charged with six counts related to these car burglaries, the stolen items, and possession of methamphetamine. Two months later, following his pretrial release from jail, he was again arrested after he stole property from a vehicle in a condominium parking garage. These additional charges were later consolidated with his earlier case.

---

[1]     Footage from Pardue's BWC with no audio shows Pardue pulling up to Kasrawi's car. The audio begins shortly afterward, when Pardue informs Kasrawi he is being detained.

Following trial, Kasrawi was convicted of (count 1) vehicle tampering (Pen. Code, § 459),[2] (count 3) grand theft of personal property (§ 487, subd. (a)), (count 5) possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)), (count 6) obtaining personal identifying information with intent to defraud (§ 530.5, subd. (c)(1)), and (counts 7 and 8) two counts of burglary, one in the first degree (§§ 459 and 460, subd. (a)).

## DISCUSSION

A.  *Although Kasrawi Was Improperly Detained, the Discovery of His Outstanding Arrest Warrant Attenuated Any Taint So that Evidence Obtained During the Subsequent Search Was Admissible.*

Kasrawi moved to suppress the evidence from the April incident on the basis that Pardue illegally detained him, making the fruits of the detention inadmissible.  (§ 1538.5.)  At the suppression hearing, defense counsel argued that Pardue detained Kasrawi immediately upon confronting him, before Pardue had any reasonable basis to believe Kasrawi might be involved in illegal activity.  Counsel gave particular weight to Pardue's use of his spotlight.  The prosecution countered that the detention did not begin until after the brief exchange where Kasrawi offered a suspicious explanation for his presence in the neighborhood.  Although the trial court considered the issue a "close call," it ultimately agreed with the People, noting that it considered Pardue's actions reasonable and denying Kasrawi's motion to suppress.

Kasrawi renews his suppression argument on appeal.  After surveying similar cases and considering the manner in which Pardue confronted Kasrawi—including his use of the spotlight, the position of his car, how quickly he got out and walked to Kasrawi, and the immediate, direct question he posed—we conclude that Kasrawi was detained before he responded to

---

[2]     Any further undesignated statutory references are to the Penal Code.

Pardue's inquiry. A reasonable person would not feel free to terminate such an encounter with law enforcement. Furthermore, the detention was unlawful because the factors known to Pardue at that point gave rise to no more than a mere hunch that Kasrawi might be involved in criminal activity. But we nonetheless affirm the denial of Kasrawi's motion to suppress on grounds not argued by either party in their briefs, but compulsory on this court: a limited exception to the exclusionary rule that applies when an officer's illegal stop is followed by their discovery of an outstanding warrant, as pronounced in both *People v. Brendlin* (2008) 45 Cal.4th 262 (*Brendlin*) and *Utah v. Strieff* (2016) 136 S.Ct. 2056, 2059 (*Strieff*).

1.   *When was Kasrawi detained?*

The Fourth Amendment and California's counterpart protect the public from unreasonable searches and seizures. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.) This protection extends to "brief investigatory stops" (*In re Edgerrin J.* (2020) 57 Cal.App.5th 752, 759) because "it is the right of every person to enjoy the use of public streets, buildings, parks, and other conveniences without unwarranted interference or harassment by agents of the law." (*In re Tony C.* (1978) 21 Cal.3d 888, 892 (*Tony C.*).) Of course, interference is warranted so long as law enforcement officers abide by the standards that govern different encounters. Generally, police contact with individuals in public places will fall into one of three categories: (1) a consensual encounter, which involves "no restraint on the person's liberty" and thus "need[s] no objective justification," (2) a detention, which "involves a seizure of the individual for a limited duration and for limited purposes" and is constitutional only when facts known to the officer give rise to a reasonable suspicion that the person is involved in some illegal activity, and (3) an arrest, which must be justified by probable cause. (*People v. Bailey* (1985)

5

176 Cal.App.3d 402, 405, citing *Florida v. Royer* (1983) 460 U.S. 491.)  Both parties agree Kasrawi was detained at some point, so the question of *when* he was detained becomes critical.  This issue turns on whether Kasrawi's encounter with Pardue (a) began in the consensual category and ripened into a detention, or (b) was a detention from the outset.

The People argue the first view; Kasrawi urges the second is the proper characterization.  To determine which is correct, we apply the principle that when law enforcement officers make some show of authority toward an individual, they have detained the person if " ' "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." ' " (*People v. Brown* (2015) 61 Cal.4th 968, 974; quoting *Brendlin v. California* (2007) 551 U.S. 249, 255).

A notable factor in this case reflecting a show of authority is the officer's use of a sustained spotlight on an individual at night, which undoubtedly signals on the otherwise empty street that the individual is "the focus of the officer's particularized suspicion." (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 791.)  But an individual's knowledge that an officer is focused on them does not necessarily mean that person is detained.  Indeed, appellate courts have consistently held that an officer's use of a spotlight *alone* is not enough to effect a detention. (*People v. Kidd* (2019) 36 Cal.App.5th 12, 21 (*Kidd*); *People v. Rico* (1979) 97 Cal.App.3d 124, 130 (*Rico*).)  There must be other factors present that remove ambiguity as to whether the person is free to leave.

A brief survey of other cases involving spotlights is instructive here.  In *Rico, supra,* 97 Cal.App.3d 124, an officer responding to reports of a shooting momentarily shined his spotlight into the cabin of another car as he drove beside it.  He then "immediately pulled back without any show of authority"

6

and tailed the other car.  (*Id*. at p. 130.)  The appellate court determined that the officer's "momentary use of the spotlight" and "notable absence of any additional overt action" made his spotlight use "insufficient to be categorized as a detention."  (*Ibid.*)

The use of a spotlight coupled with other factors produced a different conclusion in *People v. Roth* (1990) 219 Cal.App.3d 211, 215 (*Roth*), where two officers effected a detention when they shined a light on a man crossing an otherwise deserted parking lot at night.  The officers also exited their vehicle and asked the man to approach so they could speak with him.  The court deemed this initial encounter a detention because a reasonable person subject to this kind of attention from police would not feel free to leave.

A similar detention took place in *People v. Garry* (2007) 156 Cal.App.4th 1100 (*Garry*), where the officer observed the defendant standing by a parked car at night, and then "bathed defendant in light, exited his police vehicle, and, armed and in uniform, 'briskly' walked 35 feet in 'two and one-half to three seconds' directly to him while questioning him about his legal status."  (*Id*. at p. 1111.)  Explaining that the officer's "actions, taken as a whole, would be very intimidating to any reasonable person," the appellate court concluded that the defendant was detained before the officer learned any additional information about him.  (*Id*. at pp. 1111–1112.)

*Kidd, supra,* 36 Cal.App.5th 12 (*Kidd*) rounds out this trio of spotlight cases that were found to constitute detentions.  It involved an officer who parked 10 feet behind another car at night, flooding it with two spotlights, and then exited his patrol vehicle and approached to question the occupants.  (*Id*. at p. 15.)  In finding a detention occurred when the officer parked and trained his lights on the other car, the court noted that "[a]lthough the officer's approach was . . . not made in a particularly aggressive or

7

intimidating manner, a reasonable person in Kidd's circumstances would not have felt free to leave." (*Id*. at pp. 21–22.)

*People v. Perez* (1989) 211 Cal.App.3d 1492 (*Perez*) presents a contrasting study, where an officer noticed an unlit car in a motel parking lot known for drug use. He parked facing the other vehicle head on with his high beams and spotlight shining into the cab, watching for the occupants' reaction without leaving his patrol vehicle. When he saw no movement inside the car, he got out and approached to assess the occupants' sobriety. In rejecting the defendant's position that he was detained as soon as the officer shined the lights into his vehicle, the appellate court explained that the lights alone did not "manifest police authority to the degree leading a reasonable person to conclude he was not free to leave." (*Id*. at p. 1496.)

Although some language in these cases can be read to reflect a certain tension with each other, the cases can also be harmonized to establish the following principle: an officer's use of a spotlight, particularly at night, is a show of authority that might constitute a detention if it is coupled *with additional actions* from the officer that would communicate to a reasonable person they are not free to leave. Just how many other actions an officer must take to effect a detention is unclear and, like other inquiries in the realm of reasonable suspicion, a case-specific analysis is required. The ultimate question, however, is not the abstract reasonableness of the officer's actions but rather the *effect* of the cumulative show of authority on a reasonable person's assessment of whether they are free to terminate the encounter with law enforcement.

In the case before us, the spotlight factor is significant. As in *Garry*, *supra*, 156 Cal.App.4th 1100, Pardue "bathed" Kasrawi in light. It was not a momentary flash, as in *Perez*, *supra*, 211 Cal.App.3d 1492. Additionally,

8

there are at least four other factors that indicate Kasrawi was already detained before Pardue heard his ostensible explanation for being in the neighborhood. These include: (1) the proximity of Pardue's marked police vehicle, which he parked within a few feet of Kasrawi's Prius, (2) Pardue's immediate exit from his vehicle, followed by (3) his immediate advance toward Kasrawi, which left nothing but a socially acceptable distance for strangers between them, and (4) his immediate, pointed question, which demanded an answer.

While the spotlight alone may not have been enough, the authoritative " 'manner [and] mode' " of Pardue's approach and his assertion of total control removed any ambiguity as to whether Kasrawi could leave. (*Garry, supra*, 156 Cal.App.4th at p. 1112.) A reasonable person would likely respond with submission, as Kasrawi in fact did. And while Kasrawi's response is subjective and not dispositive, it lends weight to our conclusion. He was getting into his Prius when Pardue cast his spotlight on him. Upon turning to see the police vehicle, Kasrawi immediately aborted entering his car. Instead, he responded to Pardue's show of authority by staying and answering his question. Here, as in *Kidd*, *supra,* 36 Cal.App.5th 12, Pardue's actions were not overtly aggressive. But he nonetheless used several of the authoritative tools at his disposal in concert, and he did so in a manner that would impress upon a reasonable person that it would be fruitless to attempt to leave.

The People urge us to disregard *Kidd* as poorly reasoned. They critique it for not discussing *Perez*, which they argue has identical facts and a sounder outcome. (*Perez, supra*, 211 Cal.App.3d 1492.) We disagree, finding *Perez* notably distinct from both *Kidd* and this case. In *Perez*, the officer used his spotlight to investigate whether the occupants of a vehicle were alert or,

9

conversely, showing signs of intoxication. He sat in his car with bright lights trained on the other vehicle to watch the occupants' reaction, and only decided to approach their car when he observed no response. (*Id.* at p. 1494.) In the interim, ambiguity remained, and the occupants of the vehicle—had they been alert enough to do so—could have left if they wanted to avoid an encounter with law enforcement.

*People v. Tacardon* (2020) 53 Cal.App.5th 89, also relied on by the People, is no more similar in critical aspects. In that case, a deputy parked 15 or 20 feet behind a dark vehicle that had smoke emanating from its cracked windows. He trained his spotlight on the car and got out to investigate when one of the occupants, M.K., exited of her own accord. The deputy asked what she was doing, and she responded that she lived in the nearby house. At that point, the deputy could smell marijuana and asked M.K. to stay nearby. He then approached the vehicle, shined his flashlight inside, and saw indicators of large amounts of marijuana consistent with a distribution enterprise. (*Id.* at pp. 92–93.) One of the vehicle's other occupants ultimately became the defendant in the case. In determining that he was not yet detained when the deputy approached the vehicle with his flashlight, the court of appeal distinguished the timing of his detention from M.K.'s, noting that although she was detained when the deputy asked her to stay nearby, the detention of the other occupants occurred several moments later. (*Id.* at pp. 98–101.) *Tacardon* thus involved a more elaborate series of events with multiple people detained at different times. Because Kasrawi's interaction with Pardue was more like the deputy's interaction with M.K. rather than his contact with the defendant, *Tacardon*'s analysis is of limited relevance in our case.

10

Of far more utility is the BWC footage, which memorializes the speed and surety with which Pardue confronted Kasrawi. From that video and the testimonial details about the initial question Pardue posed, we conclude Kasrawi was detained at the outset—when Pardue flooded him with his spotlight, parked his marked police vehicle close to Kasrawi's car, and immediately approached him while asking a pointed question. A reasonable person would not feel free to terminate that encounter with an officer.

We appreciate the concern expressed in the concurring and dissenting opinion that we should not disincentivize officers from using their spotlights for safety purposes. And while we take care to note that the reason an officer did something is not the legal standard for determining whether an individual was detained, we do not believe that in *this case* a true tension arose between the officer's need to use a spotlight for safety purposes and the show of authority it created. As we view the BWC video and read Pardue's testimony, his patrol car headlights already provided significant illumination in the area. At the same time, however, we recognize that such a tension could arise in other cases, and we do not intend to substitute our judgment on safety protocols for that of a trained officer. Rather, in observing that an officer's show of authority is usually bolstered by a spotlight—even if it is used primarily for safety purposes—we suggest that officers might temper their *other* actions if their purpose is merely to invite a consensual encounter with the individual being contacted.[3]

---

[3]    Indeed, our conclusion might well have been different had Pardue started by asking Kasrawi, "Do you mind answering a couple of questions?" which would have implied that Kasrawi had some choice in the matter.

11

## 2. *Was the detention legal?*

Having concluded that Kasrawi was detained when he was first contacted, the detention would only be legal if Officer Pardue was aware of "specific and articulable facts" causing him to believe that "some activity relating to crime has taken place or is occurring or about to occur," and that Kasrawi was "involved in that activity." (*Tony C.*, *supra,* 21 Cal.3d at p. 892; see also *Terry v. Ohio* (1968) 392 U.S. 1, 30 [detention proper if officer observes "unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"].) But the facts known to Pardue were rather limited at that point. In terms of the general context, it was about 4:00 a.m. in a low crime area. Pardue was aware there had been two car burglaries nearby in the previous week. As to Kasrawi's actions, Pardue saw him step off a curb, cross to a legally parked Prius, and begin to get inside. All that can be said of his conduct is that he crossed a residential street at a time when most people in the neighborhood were still asleep. The circumstances were thus "devoid of indicia of his involvement in criminal activity" (*Roth, supra*, 219 Cal.App.3d at p. 215), and fall significantly short of the "specific and articulable facts" required to support a detention. (*Tony C.*, *supra,* 21 Cal.3d at p. 892.)

## 3. *Were the results of the subsequent search tainted by the illegal detention?*

An illegal detention that uncovers evidence is generally subject to the exclusionary rule, which dictates the unlawfully obtained evidence be suppressed as "fruit of the poisonous tree." (*Wong Sun v. United States* (1963) 371 U.S. 471, 488; *People v. Krohn* (2007) 149 Cal.App.4th 1294, 1299.) Kasrawi assumes that if we agree with him about the timing of his detention, then we would agree that his motion to suppress should have been granted in the trial court. But exceptions to the exclusionary rule apply "when the costs

12

of exclusion outweigh its deterrent benefits." (*Strieff, supra,* 136 S.Ct. at p. 2059.) One such exception is the intervening discovery of "a valid, pre-existing, and untainted arrest warrant." (*Id.* at p. 2061.) When this kind of discovery is made, and there are no countervailing concerns about flagrant police misconduct, "the link between the unconstitutional conduct and the discovery of the evidence is too attenuated to justify suppression." (*Id.* at p. 2059.) That was the case here, because Pardue's quick discovery of Kasrawi's outstanding warrant preceded the search incident to his arrest and cured the taint of the unlawful detention.[4]

Our conclusion on this point is guided by decisions from both the federal and state supreme courts, which have each held that a law enforcement officer's discovery of a valid warrant after an illegal stop can establish an exception to the exclusionary rule. In *Brendlin, supra,* 45 Cal.4th 262, a deputy made a traffic stop without reasonable suspicion. He questioned the vehicle's occupants, recognized one of the passengers, and then ran a records check that indicated the man had an outstanding warrant. The deputy arrested him and subsequently found evidence of methamphetamine manufacturing in the car and on his person. (*Id.* at p. 266.)

In analyzing whether the deputy's discovery of the warrant "dissipated the taint of the illegal seizure and rendered suppression of the evidence seized unnecessary," the *Brendlin* court considered the three attenuation

---

4  Although this question of attenuation based on the outstanding arrest warrant was not raised by the parties either in the suppression motion or the briefs before us, we note that the the trial court made a reference to it at the suppression hearing. We advised the parties by letter regarding the issue, and both counsel discussed it during oral argument. Neither party requested the opportunity to provide supplemental briefing.

factors enumerated in *Brown v. Illinois* (1975) 422 U.S. 590, 603–604 (*Brown*), namely the "temporal proximity" between the illegal stop and the recovery of evidence, the "presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct."  It concluded that the first *Brown* factor, although arguably weighing in favor of suppression, was outweighed by the others—the "intervening circumstance" of the warrant, and the apparent good faith of the deputy, who stopped the vehicle to investigate the authenticity of a temporary registration sticker.  (*Brendlin, supra*, 45 Cal.4th at pp. 270–272.)  It thus concluded that suppression of the evidence was unwarranted.  (*Ibid*.)

The United States Supreme Court employed a similar analysis to reach a parallel result eight years later in *Strieff, supra*, 136 S.Ct. 2056, where an officer stopped a man leaving a suspected drug house without reasonable suspicion.  After he later discovered the man was subject to a warrant, the officer conducted a search incident to arrest that yielded drugs and paraphernalia.  (*Id*. at p. 2059–2060.)  In overturning the contrary conclusion of the Utah Supreme Court, the United States Supreme Court relied on the *Brown* factors to hold the taint of the unlawful stop was attenuated by the warrant such that the exclusionary rule did not apply.  (*Strieff,* at pp. 2062–2063.)

Following these cases, we similarly conclude that the *Brown* factors here weigh in favor of applying the outstanding warrant exception to the exclusionary rule.  Although the first factor—the temporal proximity between Kasrawi's detention and the discovery of the evidence—weighs in favor of suppression, the other *Brown* factors support a finding of attenuation.  As in both *Strieff* and *Brendlin*, the officer's discovery of a warrant constituted an intervening circumstance that separated the evidence he collected from the

14

illegal detention. And this intervening circumstance was not accompanied by the kind of flagrant police misconduct that would justify exclusion—such as an " 'invented . . . justification for [a] traffic stop in order to have an excuse to run [a] warrant check' " or some other "flagrant" abuse of police power. (*Brendlin*, *supra*, 45 Cal.4th at p. 272.) Rather, it is clear from the BWC footage and his testimony that Pardue thought he detained Kasrawi only after gaining sufficient information to justify an investigatory stop. That his approach was assertive enough to make Kasrawi believe he was not free to leave does not transform this liminal illegal stop into a flagrant abuse of power. Consequently, the evidence was admissible and we therefore affirm the trial court's denial of Kasrawi's suppression motion.

B. *The Guest Parking Garage was Part of the Inhabited Dwelling House.*

Kasrawi also claims one of his convictions for residential burglary from the July incident cannot be sustained as a matter of law. In pertinent part, he asserts that because the car he burglarized was parked in the *guest* parking garage of the Marina Park Condominiums, it was not sufficiently connected to the condominiums to be the site of a residential burglary. We disagree. The outer boundary of a home is generally construed broadly for these purposes, and the specific layout of the garage confirms the entire parking area is part of the broader residential structure it sits underneath. Because the details of the garage burglary have little bearing on our review, we do not recite them at length. In short, it was undisputed at trial that Kasrawi entered the guest parking garage at the Marina Park Condominiums and took items from a car. Video surveillance caught much of the incident. What Kasrawi contests is the jury's true finding that the parking garage constituted part of an "inhabited dwelling house" within the meaning of section 460, subdivision (a).

15

First degree burglary is reserved for the serious crime of breaking into someone's home.  The associated statutory term, "an inhabited dwelling house" (§ 460, subd. (a)), has been expansively defined to include many of the areas in and around homes in order to "effectuate the legislative purposes underlying the statute, namely, to protect the peaceful occupation of one's residence."  (*People v. Fox* (1997) 58 Cal.App.4th 1041, 1045.)  The more serious consequences for burglary in the first degree also serve to discourage residential break-ins, which carry a higher risk of violence than burglaries elsewhere.  (*People v. Cruz* (1996) 13 Cal.4th 764, 775.)

Kasrawi focuses on several factors concerning the layout and use of the guest garage, including that the garage can be accessed from the street, that residents seldom use the guest garage directly, that a fence separates the guest area from the residential parking area, and that although the guest and resident parking are connected, a key is needed to pass between them.

These facts are beside the point.  The "burglary of an inhabited dwelling house may be accomplished even if the specific room that the burglar unlawfully enters is not a space where people live."  (*In re M.A.* (2012) 209 Cal.App.4th 317, 323.)  In assessing whether an area that is not used as a living space should be considered part of the inhabited dwelling house, we ask only if the area is "functionally interconnected" and " 'contiguous' " to the residence.  (*People v. Thorn* (2009) 176 Cal.App.4th 255, 262 (*Thorn*).)  For these purposes, " '[f]unctionally interconnected' means used in related or complimentary ways [and] '[c]ontiguous' means adjacent, adjoining, and in actual close contact."  (*People v. Jackson* (2010) 190 Cal.App.4th 918, 924; CALCRIM No. 1701.)

Garages and similar structures generally meet these criteria.  (See *People v. Cook* (1982) 135 Cal.App.3d 785, 796 [an attached garage was an

16

"integral part of the house" and "simply one room of several which together compose the dwelling"]; *People v. Moreno* (1984) 158 Cal.App.3d 109, 112 [detached garage connected by the roof was "functionally interconnected with, and immediately contiguous to other portions of the house"]; *In re Edwardo V.* (1999) 70 Cal.App.4th 591, 592 [garage attached to a duplex with only an exterior entry door was a part of the inhabited dwelling].) Other common use areas within apartments have also generally been considered contiguous and interconnected to the residences.[5]

Of the cases involving burglaries in garage structures, *Thorn, supra*, 176 Cal.App.4th 255 most resembles this case. In *Thorn*, the defendant burglarized a car within a covered carport situated beneath an apartment complex. In finding the area was sufficiently contiguous and interconnected with the residences above, the court of appeal focused on its function and location. The carports were "located directly underneath the apartments" and "provide[d] parking facilities for designated residents of the apartment." They were thus "inextricably related or complementary to their living space." (*Id.* at p. 263.)

Similarly here, the entire parking area is located below the condos, in an underground level comprised of two garages—one for guests and one for residents. The garages are physically connected to each other and the buildings above them. There were no factual disputes at trial as to this physical layout. And given this structure, we do not make much of the fact that the parking area in question was not designated for the direct use of the

---

5 See, e.g., *People v. Woods* (1998) 65 Cal.App.4th 345, 350 (finding an apartment complex laundry room was part of the dwelling because the safety and privacy concerns present in residences extend to the common laundry area) and *People v. Zelaya* (1987) 194 Cal.App.3d 73, 76 (an apartment basement and garage used for storage was part of the dwelling).

residents.  Residents could use that area, and they sometimes did.  The fact that anyone could turn from the street into the garage similarly does not change our analysis by converting the guest garage into the functional equivalent of street parking, as Kasrawi suggests.  Although anyone could drive inside, the garage was intended for resident guest use only and clearly marked as such.

Moreover, these arguments distract from the only relevant inquiry: whether the guest garage is (1) functionally interconnected to the condos, meaning used in related or complimentary ways, and (2) contiguous, meaning adjacent, adjoining, and in actual close contact.  We unreservedly conclude the guest garage has these characteristics.  It is used in relation to the condos because residents can direct their guests to park there and enjoy, as a benefit of their residency, the complimentary feature that visitors can park on site— much as a homeowner enjoys the use of their driveway to host guest vehicles.  The guest garage is also physically part of the condo structure because it comprises the adjoined basement area.  Given these specifics, Kasrawi's contention that his conviction for residential burglary was legally untenable and unsupported by the evidence is unavailing.

## DISPOSITION

The order denying Kasrawi's motion to suppress and the judgment are affirmed.

DATO, J.

I CONCUR:


McCONNELL, P. J.

18

BENKE, J., Concurring and Dissenting.

I agree with the majority's analysis regarding application of the warrant exception to the exclusionary rule, and therefore concur in the affirmance. I write separately to express my views regarding the officer's initial encounter with Omar Kasrawi and, specifically, the effect of the officer's use of his spotlight to illuminate Kasrawi and the surrounding area.

As stated in the majority opinion, the incident occurred at approximately 4:00 in the morning on a quiet and somewhat secluded residential street. Officer John Pardue was patrolling the area as a single-man unit, alone and without backup. The sky was dark, and the area was illuminated only by an occasional amber streetlamp. Officer Pardue described the lighting as "poor."

As he was driving through the neighborhood, Pardue saw a person—later identified as Kasrawi—walk down the end of a sloped driveway on the west side of the road, into and across the street, to a vehicle parked along the curb on the east side of the road. There were no sidewalks on the street. Kasrawi was dressed in dark clothing, including a long-sleeved black puffy jacket, and the vehicle was parked at least one full car length away from the nearest streetlamp. Pardue regularly patrolled the area and did not recognize Kasrawi or the vehicle he approached.

Kasrawi opened the door and began to step into the vehicle. Intending to speak with Kasrawi, Pardue illuminated his spotlight, stopped his patrol car, and began to exit the vehicle. Kasrawi turned back towards Pardue and shut the door to the vehicle he had been about to enter. Still positioned by his own car door, Pardue asked Kasrawi where he was coming from. Kasrawi stated he was on his way down from Los Angeles and had stopped there to

rest. Finding the response suspicious, Pardue asked Kasrawi to have a seat, placed him in handcuffs, and informed him he was being detained.

The majority concludes Kasrawi was detained, "when Pardue flooded him with his spotlight, parked his marked police vehicle close to Kasrawi's car, and immediately approached him while asking a pointed question," and that the detention was unlawful because there was not enough at that time to create a reasonable suspicion criminal activity was afoot. I disagree on both accounts.

First, as counsel for Kasrawi conceded during oral argument, there was nothing inherently improper about Pardue approaching Kasrawi and asking him what he was doing there. An officer is entitled to make such inquiry, even in the absence of reasonable suspicion. (See *People v. Parrot* (2017) 10 Cal.App.5th 485, 492.) Rather, from Kasrawi's perspective, the issue was the "show of authority" that occurred when Pardue stopped his vehicle behind Kasrawi's and illuminated his spotlight.

As set forth in the majority opinion, several cases address the use of a spotlight in a similar manner and, in my view, three are of particular importance here: *People v. Perez* (1989) 211 Cal.App.3d 1492 (*Perez*), *People v. Kidd* (2019) 36 Cal.App.5th 12 (*Kidd*), and *People v. Tacardon* (2020) 53 Cal.App.5th 89 (*Tacardon*). In each of these three cases, the court addressed a situation in which a patrol car stopped behind or in front of a parked car and illuminated the vehicle and surrounding area with a spotlight.

In *Perez*, the officer positioned his car head on with a parked and occupied vehicle, leaving enough room for the vehicle to drive away, and activated his high beams as well as the spotlights on each side of the patrol car. (*Perez, supra,* 211 Cal.App.3d at p. 1494.) When the occupants did not respond, he approached the vehicle to speak with them. (*Ibid.*) The appellate

2

court concluded the patrol car facing the suspect car and illuminating it with its high beams and spotlight did not constitute a detention.  (*Id.* at p. 1496.) In reaching that conclusion, the court reasoned, "the use of high beams and spotlights might cause a reasonable person to feel [them]self the object of official scrutiny, [but] such directed scrutiny does not amount to a detention." (*Ibid.*)

Similarly, in *Kidd*, the officer made a U-turn and parked approximately 10 feet behind a parked car and pointed his two spotlights at the vehicle. (*Kidd, supra,* 36 Cal.App.5th at p. 15.)  The officer then approached the car and, after detecting a strong odor of marijuana, shined a flashlight into the window and asked the occupants what they were doing.  (*Ibid.*)  Reasoning that motorists are trained to yield when law enforcement pulls in behind them and turns on lights, regardless of the color of those lights, the appellate court concluded the defendant was detained "when the officer made a U-turn to pull in behind him and trained spotlights on his car."  (*Id*. at p. 21.)  In addition, although the court noted the officer's approach was not aggressive or intimidating, it further concluded "any ambiguity was removed when the officer more or less immediately exited his patrol vehicle and began to approach Kidd's car."  (*Ibid*.)

Thus, in both cases, the appellate courts analyzed whether a detention occurred based solely on the officer stopping a marked patrol vehicle behind or in front of the suspect vehicle and illuminating the suspect car with the patrol car's spotlights.  The court in *Perez* concluded that combination of actions was *not* sufficient to amount to a detention, while the court in *Kidd* concluded that it was.  As noted in the majority opinion, the court in *Kidd* did not address or make any attempt to distinguish the contradictory holding in *Perez*.  The majority opinion attempts to distinguish the cases based

3

primarily on the officer's intent in using the spotlight—to investigate whether the occupants were alert—but the officer's intent is not particularly relevant. Instead, the question we must address is whether a person in the defendant's position would reasonably believe they were free to leave. (*People v. Brown* (2015) 61 Cal.4th at p. 974 (*Brown*).) In both cases, the officer's outward actions towards the defendants—stopping a marked patrol car behind or in front of the suspect car and training the spotlights on the suspect car—were the same.

More recently, the court in *Tacardon* addressed the inconsistent holdings in *Kidd* and *Perez*. Similar to those cases, the officer in *Tacardon* made a U-turn, pulled up 15 to 20 feet behind a parked vehicle, and turned on a spotlight to illuminate the vehicle. (*Tacardon, supra,* 53 Cal.App.5th at p. 92.) One of the occupants voluntarily exited the vehicle as the officer approached and, smelling marijuana, the officer asked the individual to stay near the car. (*Id.* at pp. 92–93.) There was no dispute that the individual that exited the vehicle was detained when the officer commanded her to stay nearby, but the issue before the court was at what point another individual that remained in the car was detained. (See *Tacardon, supra,* at p. 99.) In addressing that question, the court disagreed with the analysis in *Kidd*, and concluded, as in *Perez*, that, "although a person whose vehicle is illuminated by police spotlights at night may well feel he or she is 'the subject of official scrutiny, such directed scrutiny does not amount to a detention.' " (*Id.* at pp. 99–100.) I agree with that conclusion, and find it particularly compelling in situations such as this, where the officer is alone and a reasonable individual might conclude the officer used the spotlight to illuminate the area, either for his or her own safety or to otherwise assess the situation.

4

The majority acknowledges the spotlight alone might not have been enough to constitute a detention but asserts the " 'manner or mode' " of Pardue's approach removed any ambiguity as to Kasrawi's ability to leave. I disagree. As an initial matter, Pardue stopping his patrol car behind Kasrawi's vehicle was not materially different than the actions of the officers in *Perez* and *Tacardon*, and, if anything, it was less aggressive. Pardue did not make a U-turn, and there is no indication he increased his speed or otherwise "pulled up" on Kasrawi in an aggressive manner. To the contrary, Pardue testified he was driving approximately 15 to 20 miles per hour and, in the video, he appears to slow to a stop in a typical, routine manner.

Moreover, the video and the associated testimony suggest Kasrawi stopped entering his vehicle and voluntarily turned towards Pardue as Pardue exited his own vehicle, perhaps even before Pardue's initial inquiry. Thus, if we accept the notion that the patrol car and spotlight alone did not signal that Kasrawi was not free to leave, it appears Kasrawi voluntarily engaged in the initial inquiry. Regardless, in my view, Pardue's actions once he exited the car also were not particularly aggressive and, to the contrary, it appears he initially stayed near the door of the car, moving closer to Kasrawi only after deciding to detain him.

As noted previously, counsel conceded at oral argument that Pardue's inquiry, in and of itself, was not improper; the issue was the alleged show of authority effectuated by Pardue driving up and using the spotlight. (Compare *People v. Garry* (2007) 156 Cal.App.4th at p. 1111 [detention occurred where officer immediately began questioning defendant regarding his legal status]; *People v. Roth* (1990) 219 Cal.App.3d at p. 215 [detention occurred when officers asked the defendant to approach them].) Counsel suggested the stop would have been less problematic if Pardue had used a

5

handheld flashlight instead of the spotlight, but as Pardue described, the events unfolded in a manner of seconds and he was simultaneously attempting to stop, put his car into park, exit, and turn on his body-worn camera. As any reasonable person would likely understand, the spotlight was a significantly safer and more effective tool for Pardue to use in order to illuminate the area. Thus, in my view, the spotlight was not used to detain; it was used to illuminate for the purposes of officer safety.

Second, even if the combination of the patrol car, the spotlight, and Pardue's initial approach were enough to make Kasrawi believe he was not free to leave, I would nevertheless conclude the brief investigatory stop was justified. Kasrawi was not just casually walking up to his car and had, instead, crossed from the end of a driveway, in the dark, at 4:00 in the morning. At least two cars had been broken into within the past week in that area and there were no other people around and no indication an event was occurring at the house from which it appeared Kasrawi came. Based on those facts, I would conclude Pardue had sufficient reason to believe criminal activity was afoot to justify the initial, brief inquiry. (See *Brown, supra,* 61 Cal.4th at pp. 985–986 [brief investigatory stop may be appropriate even in the absence of probable cause where specific and articulable facts, taken together with rational inferences, warrant further investigation]; *Terry v. Ohio* (1968) 392 U.S. 1, 22 [a series of acts, each perhaps innocent in itself, may warrant further investigation when taken together].)

Finally, from a policy perspective, holding that the circumstances in this case constituted an unlawful detention places officers like Pardue in the difficult position of either approaching an individual or vehicle alone in the dark, without the benefit of a readily available tool that could significantly increase their safety, or simply foregoing the contact altogether. Here,

6

although the officer could not have known all of the relevant facts at the time of his initial approach, he was entitled to rely on his training and experience. Indeed, Kasrawi was armed with at least two knives.

For those reasons, I would conclude Kasrawi was not detained until such time as his voluntary and problematic response confirmed Pardue's initial suspicions, and, in any event, Pardue's use of the spotlight and initial inquiry were appropriate given the totality of circumstances.

BENKE, J.

7